Marcus JONES, Willie B. Hodge, Clifton Nickels and Clarence L. Irving, Plaintiffs-Appellants,

v.

LEE WAY MOTOR FREIGHT, INC., Defendant-Appellee.

No. 464–69.

United States Court of Appeals, Tenth Circuit.

Aug. 17, 1970.

S. Norman Sorrell, of Mandell & Wright, Houston, Tex., for plaintiffs-appellants.

John B. Dudley, Oklahoma City, Okl. (Richard H. Champlin and Richard G.

Taft, and McAfee, Dudley, Taft, Cates & Mark, Oklahoma City, Okl., of counsel, were with him on the brief) for defendant-appellee.

David Copus, Washington, D. C. (Stanley P. Herbert, Gen. Counsel, Russell Specter, Deputy Gen. Counsel, and Julia Cooper, Washington, D. C., were with him on the brief) for amicus curiae Equal Employment Opportunity Comm.

Before BREITENSTEIN, HILL and SETH, Circuit Judges.

BREITENSTEIN, Circuit Judge.

The plaintiffs-appellants, four Negro truck drivers employed by defendant-appellee Lee Way Motor Freight, Inc., allege in their complaint that the company's refusal to grant requested transfers was an unlawful employment practice in violation of Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e et seq. The case was heard on answers to interrogatories and stipulated testimony. The district court found that the company's no-transfer policy was established for "rational and bona fide considerations" and was indiscriminately applied. Relief was denied, Jones v. Lee Way Motor Freight, Inc., W.D.Okl., 300 F.Supp. 653, and this appeal followed. Jurisdiction is found under 42 U.S.C. § 2000e–5(f).

The company has two categories of drivers, line (over the road) and city. Line drivers receive higher wages, and line jobs are generally considered superior to city jobs. Each group is covered by a separate union contract. Company policy prohibits transfers between the two groups. In 1964, 1966, and 1968, there were 353, 516, and 542 line drivers respectively. At all pertinent times all of the line drivers were white. For the same years the company employed 52, 169, and 196 city drivers of which 12, 33, and 38 (or about 20%) were Negro.

The no-transfer policy was initiated in 1957. The company says that it adopted the policy for valid reasons which include inability of transferees to ad-

just to new working conditions, difficulties such as seniority because each category is covered by a different union contract, and the retraining required for both the transferee and his replacement. There is no claim that the policy has been unfairly or discriminately applied.

Plaintiffs, employed as city drivers at the company's Houston terminal before July 2, 1965, the effective date of the Act, sought transfers to the line category in 1966. The requests were denied on the basis of the no-transfer policy. The plaintiffs went to the Equal Employment Opportunity Commission, which found reasonable cause to believe that the company was engaging in unlawful employment practices. Voluntary compliance was not achieved, and the plaintiffs brought this suit.

The essence of plaintiffs' claim is that application of the superficially neutral no-transfer policy to them is discriminatory because it locks them in inferior jobs which were the only ones available in the days of the company's discriminatory hiring practices. They say that although the policy may be rational, it cannot be justified as necessary to the business, and therefore is an unlawful employment practice which violates § 2000e–2(a). To sustain their position, the plaintiffs rely heavily on cases holding that Title VII affords relief from present effects of past discrimination.

■ Plaintiffs do not rest their claim on discriminatory hiring and cannot, because they were hired before the Act became effective. However, discriminatory hiring is essential to their case because it is the premise of the argument that the no-transfer policy is discriminatory. The plaintiffs emphasize the employment statistics and urge that the district court misapprehended the value of this evidence in disclosing the company's pre-Act employment practices. In racial discrimination cases, statistics often demonstrate more than the testimony of many witnesses, and they should be given proper effect by the courts. State of Alabama v. United States, 5

Cir., 304 F.2d 583, 586, aff'd, 371 U.S. 37, 83 S.Ct. 145, 9 L.Ed.2d 112; United States v. Hayes International Corp., 5 Cir., 415 F.2d 1038, 1043; United States v. Sheet Metal Workers, 8 Cir., 416 F.2d 123, 127, n. 7, and Cypress v. Newport News General & Nonsectarian Hospital Ass'n, 4 Cir., 375 F.2d 648, 654.

In the case at bar, the statistics show that at no time between July 1, 1964, and March 1, 1968, did the company employ a single Negro line driver in spite of the fact that there were between 353 and 542 men in that category. Although all city drivers during this period were not Negroes, all Negro drivers were city drivers. The line driver group is sufficiently larger than the city driver group that approximately 80% of the white drivers are in the line category. In short, there were no Negro line drivers; most whites were line drivers; and all Negroes were city drivers.

■ In the light of the large number of line drivers, the statistics establish a prima facie case that during the 1964–1968 period race was a factor in staffing the two driver categories. See Turner v. Fouche, 396 U.S. 346, 360, 90 S.Ct. 532, 24 L.Ed.2d 567. Nothing in the record leads us to believe that the situation was any different in preceding years. The company's conclusory claims that it has never discriminated against Negroes in hiring line drivers do not overcome this prima facie case. Turner v. Fouche, supra, and Dailey v. City of Lawton, 10 Cir., 425 F.2d 1037. True, no specific instances of discrimination have been shown. However, because of the historically all-white make-up of the company's line driver category, it may well be that Negroes simply did not bother to apply. See United States v. Sheet Metal Workers, supra, 416 F.2d at 132, and Lea v. Cone Mills Corporation, M.D.N.Car., 301 F.Supp. 97, 102.

In any event, lack of specific instances does not rebut the fact that at no time before the institution of this action had the company employed a Negro line

driver. The company's claimed recent efforts to recruit Negro line drivers and its hiring of two in August, 1968, do not change the situation, because our concern is with the employment practices at the time when the plaintiffs were hired. We conclude that when the plaintiffs were hired, the driver categories were staffed along racial lines to the extent that no Negroes would be hired as line drivers.

The next question is whether the pre-Act discriminatory hiring practices make application to the plaintiffs of the uniform and neutral no-transfer policy an unfair employment practice in violation of § 2000e–2(a), which provides:

"It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin."

The problem presented was first discussed in Quarles v. Phillip Morris, Inc., E.D.Va., 279 F.Supp. 505. In that case the company's plant was organized on racial lines so that certain departments had exclusively white employees and others exclusively Negro employees. After these discriminatory practices were stopped, interdepartmental transfers were allowed on a non-racial basis when vacancies occurred in an entry level job but the transferee lost his seniority and was placed at the bottom position within the new department. The court found that the result of this condition was to perpetuate the effects of discriminatory hiring because a Negro transferring to another department, into which he would not have originally been hired, would continue to be at a competitive disadvantage to the whites who had worked for the company for a shorter time but who had started in that department. After a careful review of the legislative history, the court concluded that the seniority provisions were inherently discriminatory and violated Title VII.

Since Quarles, numerous cases have held that superficially neutral policies violate Title VII if their effect is to perpetuate past racial discrimination. See Local 189, United Papermakers and Paperworkers v. United States, 5 Cir., 416 F.2d 980, cert. denied 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 100 (job seniority); United States v. Sheet Metal Workers, supra (union employment referrals); Griggs v. Duke Power Co., 4 Cir., 420 F.2d 1225 (education requirement as criterion for transfer); and Local 53 of the International Ass. of Heat and Frost Insulators and Asbestos Workers v. Vogler, 5 Cir., 407 F.2d 1047 (union membership and referral); see also United States v. International Brotherhood of Electrical Workers, Local No. 38, 6 Cir., 428 F.2d 144 (union membership and referral).

■ We believe that in principle the case at bar is no different from those cited. Because of the company's employment policies at the time plaintiffs were hired, they were ineligible for consideration for jobs as line drivers. They were systematically relegated to the lower paying, lower status job of city driver. Now at a time when the company seems to be actively seeking Negro line drivers, plaintiffs are unable to compete for these jobs, without quitting their present jobs, because of the no-transfer policy. They are locked in jobs which, because of their race, were the only ones previously available to them. The situation is perhaps more critical than that in Quarles and some of the other cases. At least there the transfers were allowed, although under onerous conditions. In

our opinion the no-transfer policy is a present effect of past discrimination when applied to the plaintiffs.

The company argues that because the no-transfer policy locks in white as well as Negro city drivers, it is not discriminatory. Roughly 80% of the white drivers were employed as line drivers. The 20% hired as city drivers presumably had the opportunity to apply as line drivers but either were not qualified or preferred city work. In any event, race was not a determinative factor in their employment as city drivers, as it was with the Negroes. Although the no-transfer provisions may have the same ultimate effect on both white and Negro city drivers, the difference in the factors underlying their initial employment as city drivers is sufficient to make the policy discriminatory as to the latter but not the former.

■ A neutral policy which is inherently discriminatory may nevertheless be valid if it has business justification. The district court found that the no-transfer policy was "established as a result of other rational and bona fide considerations." Plaintiffs do not challenge this finding as such. Rather they contend that the court should have applied the more stringent, and correct, test of business necessity and that, measured against this standard, the no-transfer policy is not justifiable.

The Fifth Circuit has adopted the business necessity test. See Local 53 of the International Ass. of Heat and Frost Insulators and Asbestos Workers v. Vogler, supra, and Local 189, United Papermakers and Paperworkers v. United States, supra. In Local 189, the court said, 416 F.2d at 989:

"When an employer or union has discriminated in the past and when its present policies renew or exaggerate discriminatory effects, those policies must yield, unless there is an overriding legitimate, non-racial business purpose."

The Fourth Circuit, in Griggs v. Duke Power Company, supra, went further.

Although it found that the employer's educational and testing requirements served a genuine business purpose, the court held that these requirements must be waived as to those Negroes who were locked in by a combination of the requirements and discriminatory hiring practices. 420 F.2d at 1230–1231. We believe that the issues with which we are concerned are not affected by the grant of certiorari in Duke. See 398 U.S. 926, 90 S.Ct. 1819, 26 L.Ed.2d 88.

The remedial nature of Title VII requires the adoption of the business necessity test. If employers or unions could pursue, upon a showing of mere rationality, neutral policies which have the effect of perpetuating past discrimination, the value of the principles developed in Quarles and subsequent cases would be eroded. When a policy is demonstrated to have discriminatory effects, it can be justified only by a showing that it is necessary to the safe and efficient operation of the business. See Local 189, United Papermakers and Paperworkers v. United States, supra, 416 F.2d at 989.

■ The three reasons advanced to justify the no-transfer policy are (1) bad experience with transfers in the past, (2) cost of training both the transferee and his replacement, and (3) grievances and other problems which might arise from the fact that the job categories are covered by different union contracts. There is no contention that the policy, adopted in 1957, seven years before the passage of the Act, was other than a bona fide effort by the company to resolve what it considered to be real problems. Although the reasons advanced in justification are concededly not insubstantial, we believe that they fall short of demonstrating business necessity.

The difficulties resulting from previous transfers, basically that the transferee had difficulty in adjustment and often requested retransfer, might be largely alleviated by screening plaintiffs in the same way that prospective line

drivers are interviewed. The plaintiffs' willingness to pursue this case indicates that they genuninely want to be line drivers and militates against any conclusion that the company's experience with them will be the same as it was with previous transferees.

The training costs are somewhat illusory. To fill a line driver vacancy with a new hire rather than a transferee will entail as much training if not more because a transferee has some knowledge of company policy and procedure. The training of a new city driver to replace the transferee will entail some costs, but we believe that these would not be substantial enough to outweigh the detriment to the plaintiffs of permanently locking them in city drivers' jobs.

Much the same might be said of the potential personnel problems occasioned by transfers and resulting from two union contracts. These may never develop. The record shows that in the case of the one city driver who was inadvertently allowed to transfer, the union sided with him when the company tried to return him to his previous job. We will not accord this contention greater weight than the plaintiffs' rights under Title VII. In short, we are not persuaded that the no-transfer policy is essential to the safe, efficient operation of the company's business.

■ To summarize, we hold that the no-transfer policy, as applied to plaintiffs, is an unlawful employment practice within the meaning of § 2000e–2(a) because it perpetuates past discrimination, by preventing them from now having jobs which were formerly denied to them because of their race, and because it does not satisfy the business necessity test. Although the company did not adopt the policy with the intention of discriminating, the practice was followed deliberately, not accidently. We conclude that the company "is intentionally engaging in an unlawful employment practice" within the meaning of § 2000e–5(g). See, e. g., Local 189 United

Papermakers and Paperworkers v. United States, supra, 416 F.2d at 996. This conclusion is not at odds with the provision of § 2000e–2(j) that the Act shall not be interpreted to require preferential treatment. In our opinion the present correction of past discrimination is not preferential treatment. See United States v. International Brotherhood of Electrical Workers, supra.

■ Section 2000e–5(g) authorizes the district court to "order such affirmative action as may be appropriate." In our opinion the no-transfer policy cannot be used to bar these plaintiffs from application for line jobs without surrendering their positions as city drivers. The company must consider such applications and judge them by the same standards as all other applicants. This form of relief will alleviate to some extent the present consequences of the company's past hiring policies. On the basis of the record presented and the statements of counsel at the time of argument, we express no opinion on the seniority problems which may arise in the event that one of the plaintiffs qualifies and is accepted for a line job.

Reversed and remanded for further proceedings consistent with this opinion.