**Paul SPURLOCK, Plaintiff,**

v.

**UNITED AIRLINES, INC., Defendant.**

**Civ. A. No. C-2157.**

United States District Court,
D. Colorado.

June 18, 1971.

William H. Lewis, Philip M. Jones, Cole & Lewis, Denver, Colo., for plaintiff.

D. Monte Pascoe, William Emig, Ireland, Stapleton, Pryor & Holmes, Denver, Colo., for defendant.

MEMORANDUM OPINION

WINNER, District Judge.

Plaintiff brings this action under 42 U.S.C. § 2000e–5, which prohibits discrimination in employment practices on the basis of race, color, religion, sex or national origin. Defendant admits that plaintiff submitted an application for employment as a flight officer, and asserts that the reasons plaintiff was not employed had nothing to do with his race.

Plaintiff's initial application for employment by United as a flight officer was submitted May 19, 1969. On that date he was 29 years of age, he had completed two years of college, and he had logged 204 hours of flight time. Some months before his application was sub-

mitted, plaintiff had obtained from United a brochure which listed the qualifications for flight officers. The qualifications set forth in the brochure were:

A commercial pilot's license, two years of college and excellent physical condition. The brochure indicated that exceptionally well qualified applicants through age 35 might be considered and that the college requirement might be waived for applicants with equivalent experience and excellent qualifications. It was further said that possession of an instrument rating would enhance the chances of an applicant but that it was not a necessary requirement. The brochure then continued:

"You need only as many flying hours as are required for a commercial license, generally 165 to 200 hours. Our training program is designed to make you thoroughly proficient regardless of the extent of your flight background. We are in the flying business and can give you all the flying you need.

"Your technical qualifications are important, but there are other factors that will be considered in the selection process. We are interested in your ability to advance in time to a Captain's rating. Your flight aptitude, learning ability, temperment, attitude, appearance and ability to get along with others, all of these things will be given due consideration."

On June 2, 1969, plaintiff received a reply from United saying, "While you are qualified in many respects, we have other applicants whose overall qualifications more nearly meet the needs of this particular position. For this reason, we are unable to further encourage you at this time."

Although not disclosed to plaintiff, United had increased its requirements for flight officers in April of 1969. A memorandum was circulated to the personnel department on April 17, 1969, which said in material part:

"This is a follow-up confirming my meter of April 14, advising you that any new flight officer candidates being placed into process should possess college degrees. In addition, in view of the current status—with approximately 189 flight officer applicants in process—we suggest the following guide lines be used in placing candidates into process.

(1) College degree;

(2) 500 hours of flight time (minimum);

(3) Commercial license and instrument rating;

(4) Age 21 through 29."

This was not made known to plaintiff, but somehow an advertisement in the March 19, 1969, Denver Post came to his attention. That advertisement by United in the help wanted section of the newspaper listed the qualifications for the job as follows:

"To qualify, you need a commercial pilot's license (1,000 hours logged time). Two years college, degree preferred, age 21 to 29, * * *"

This advertisement piqued plaintiff's curiosity, and in May, 1969, he sent his wife to United's Denver employment office to inquire concerning the job qualifications. [Whether her trip to the personnel office preceded or followed plaintiff's formal job application is not clear from the testimony, but it really makes no difference.] Plaintiff testified that he sent his wife instead of going himself because he suspected that United was guilty of discrimination, and his wife, a white, would not arouse suspicion on United's part. She was given the same brochure plaintiff had received earlier that year by mail, and, with commendable honesty, she testified that when she picked up the brochure she was told that it was not completely current, and that some changes in job qualifications had been made. However, the details of the changes in job qualifications were not discussed with her. There was some suggestion by United's witnesses that an insert was included in the brochure, but this was denied by plaintiffs, and the Court finds that no insert was in the bro-

chure delivered to plaintiff's wife. In fact, it does not seem possible that it could have been, because the insert was not printed until June, 1969. That insert set forth the job qualifications as being:

*"Flight Officer Qualifications*

"For your information, United Airlines is currently processing applicants for the flight officer position, who possess the following qualifications:

Male

FAA Commercial License

Instrument Rating

500 hours minimum flight time

* College Degree

Age 20 through 29, inclusive

Height 5′ 6″ to 6′ 4″

Excellent physical condition

Vision 20/70, Correctable to 20/20 with glasses

"Your technical qualifications are important, but there are other factors that will be considered in the selection process. We are interested in your ability to advance in time to a Captain's rating. Your flight aptitude, learning ability, temperment, attitude, appearance and ability to get along with others, all of these things will be given due consideration.

" * College degree may be waived for applicants with military flight experience and excellent qualifications."

Commencing July 2, 1969, a running battle between plaintiff's lawyers and United broke out. By his letter of July 2, 1969, plaintiff's lawyer commented that Spurlock had "been to the Colorado Civil Rights Commission to no avail," and he threatened to take the matter to the Regional Federal Authorities. Correspondence between counsel and United continued into October, 1969, and on March 9, 1970, plaintiff advised United by letter:

"Due to my continued interest in United Air Lines, I would like to submit additional and current qualifications for the position of Flight Officer.

"Since the time of my initial application, I have increased my total flight time to five hundred hours, and earned my multi-engine rating."

Not unpredictably, this lawsuit followed two weeks later, and in this complaint plaintiff asks:

1) Loss of approximately $6,500 in earnings.

2) Loss of retirement benefits.

3) Loss of seniority benefits.

4) Loss of insurance benefits.

5) Injunctive relief preventing United from "engaging in or repeating its unlawful employment practices toward the plaintiff or any other member of the Negro race.

6) Attorneys' fees.

■ In a second count, plaintiff prays exemplary damages, but this claim was dismissed at time of trial, and, for the record, Count Two of the complaint is ordered dismissed for the reason that there was absolutely no showing that any acts of United were "attended by circumstances of fraud, malice or insult, or a wanton and reckless disregard of plaintiff's rights and feelings." In so ruling, the Court does not imply that the Colorado statute concerning exemplary damages [C.R.S. '63, 41–2–2] is applicable to a Civil Rights suit. In fact, the Court has grave doubt as to its applicability. However, it is not necessary to pass on this question, because even if it is applicable, the proof here does not even approach the proof required for an award of exemplary damages.

Undeniably, the air line industry has been in a slump. Many pilots as well as many persons in other job classifications have been laid off. Had plaintiff been employed, it is certain that because of his lack of seniority, he soon would have been out of a job. Accordingly, because of this, plaintiff's claim for monetary damages is for an uncertain amount. Nevertheless, if plaintiff is correct in his position, he is entitled to some monetary relief and he is entitled to other relief.

Plaintiff has established that United employs approximately 5,900 flight officers, and of that total, only 9 are blacks. He has also shown that one Nicholson who applied for a flight officer's job on April 23, 1969, was employed and that one LaSasso who applied for a flight officer's job on June 29, 1965, was employed. He asks that discrimination be inferred from these two employments.

Nicholson had a college degree. It was in subjects which more nearly approached United's desire for applicants with a background in the hard sciences than did plaintiff's two years of college training. He had 409 hours of flight time with a background of military training. His personnel file reflects this comment by United's flight manager:

"Mr. Nicholson has a fine background in all depts xcept total flight time. This is the only shortcoming I can find. In view of his age, the fact that he has been service trained and his 409 hours are in jet aircraft along with the fact that he has 4 yrs of college and has a degree, I believe a concession should be considered as to total time."

LaSasso was somewhat of a special case. He had applied in 1965, and had been accepted during a time when the job qualifications were lower. However, because of physical problems, he could not complete his training. When these physical problems had been corrected, United, believing that it had a prior commitment to LaSasso, employed him. Even so, he had a college degree in business with minors in science and mathematics, 400 flight hours, a commercial license and an instrument rating. Additionally, he had military flight training. Thus, both Nicholson and LaSasso more nearly met United's standards than did plaintiff.

Job applications are received by United both by mail and in person. The application form makes no inquiry as to race, and, accordingly, United has no way of knowing how many mail applications it has received from minority groups unless a personal interview followed. During the time material to this case, United has received personal applications (as distinguished from mail applications) for jobs as flight officers from three blacks. One of the three was offered a job; the second was given the opportunity for further testing and the third was plaintiff whose application was turned down on its face.

When received by United, plaintiff's application was reviewed by a clerical employee who had no apparent way of knowing that plaintiff was a negro. That clerical employee circled in red on the application form plaintiff's age (29) which was at the upper limit of eligibility, his two years of college, and his 204 hours of flight time. This action by the clerical employee led to the letter of June 2, 1969, advising plaintiff that it was unlikely that he would be employed.

Although, as has been noted, plaintiff in his complaint seeks damages and, in effect, an injunctive order requiring his employment, plaintiff's claims were substantially narrowed at time of oral agreement. At that time it was urged only that plaintiff should not have been rejected on the basis of his application alone, but that (in the words of plaintiff's counsel) Spurlock should have been given an equal opportunity to fail the tests given to persons who met the minimum qualifications established by United, even though he did not meet those same qualifications. Seemingly, it is plaintiff's contention that although United has a right to set up minimum standards for all applicants before they will be given more definite tests, it has no right to apply those standards to members of minority races. Additionally, plaintiff seems to say that he would have no complaint had he been permitted to take the tests and flunked, but, says plaintiff, Title VII gives him a right to take the test.

Plaintiff relies heavily on Parham v. Southwestern Bell Telephone Co. (8 Cir.), 433 F.2d 421, and Griggs v. Duke Power Company, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158. Defendant urges

Jones v. Lee Way Motor Freight, Inc. (10 Cir.), 431 F.2d 245, and 29 C.F.R. 1607.5(c) (iii).

In *Parham*, the company had a professed policy against discrimination, but the evidence there showed that in the face of this announced policy, "the proportion of non-white employees had decreased from 1.86 percent in September, 1964, to 1.71 percent in June, 1966." This, of course, was a percentage of all employees, while the only evidence we have in our case is the percentage of flight officers. It was said in *Parham*:

"We hold as a matter of law that these statistics, which revealed an extraordinarily small number of black employees, except for the most part as menial laborers, established a violation of Title VII of the Civil Rights Act of 1964."

In the same case it was also said:

"Although the company's discrimination in employment against blacks prior to February, 1967, furnishes a strong inference that Parham was rejected for employment because of racial considerations, such a presumption is not conclusive. The trial court, upon all the evidence, determined that the company refused to hire Parham because of the poor recommendation it had received from a previous employer, rather than on account of his race. Although the recommendation may have unfairly penalized the applicant, it did adversely reflect upon Parham's dependability as a future employee. Nothing in the record indicates that the appellee's background investigation of Parham was anything other than a good faith effort to explore his prior employment experience. The trial court's conclusion on this issue, supported by the record, is not 'clearly erroneous'."

Jones v. Lee Way Motor Freight, Inc. (10 Cir.), 431 F.2d 245, recognizes the importance of statistics and holds that statistics may establish a prima facie case of discriminatory hiring. It was there said:

"The plaintiffs emphasize the employment statistics and urge that the District Court misapprehended the value of this evidence in disclosing the company's pre-Act employment practices. In racial discrimination cases, statistics often demonstrate more than the testimony of many witnesses, and they should be given proper effect by the courts. * * *

"In the case at bar, the statistics show that at no time between July 1, 1964, and March 1, 1968, did the company employ a single Negro line driver in spite of the fact that there were between 353 and 542 men in that category. Although all city drivers during this period were not Negroes, all Negro drivers were city drivers. The line driver group is sufficiently larger than the city driver group that approximately 80 percent of the white drivers are in the line category. In short, there were no Negro line drivers; most whites were line drivers; and all Negroes were city drivers.

"In the light of the large number of line drivers, the statistics establish a prima facie case that during the 1964–1968 period race was a factor in staffing the two driver categories. * * * Nothing in the record leads us to believe that the situation was any different in preceding years. The company's conclusory claims that it has never discriminated against Negroes in hiring line drivers do not overcome this prima facie case."

In our case, the statistics show a miniscule percentage of Negro flight officers employed by United, and under the holdings of *Parham* and *Lee Way Motor Freight*, it would seem that these statistics establish a prima facie case in support of plaintiff's claim. In *Lee Way Motor Freight*, the exact question before the Court was not one of hiring, but, rather, it was one of job transfer, but the Court held that the same principles applied. It there held:

"The company argues that because the no-transfer policy locks in white as

well as Negro city drivers, it. is not discriminatory. Roughly 80% of the white drivers were employed as line drivers. The 20% hired as city drivers presumably had the opportunity to apply as line drivers but either were not qualified or preferred city work. In any event, race was not a determinative factor in their employment as city drivers, as it was with the Negroes. Although the no-transfer provisions may have the same ultimate effect on both white and Negro city drivers, the difference in the factors underlying their initial employment as city drivers is sufficient to make the policy discriminatory as to the latter but not the former.

"A neutral policy which is inherently discriminatory may nevertheless be valid if it has business justification. The district court found that the no-transfer policy was 'established as a result of other rational and bona fide considerations.' Plaintiffs do not challenge this finding as such. Rather they contend that the court should have applied the more stringent, and correct, test of business necessity and that, measured against this standard, the no-transfer policy is not justifiable.

"The Fifth Circuit has adopted the business necessity test. * * * In Local 189, [United Papermakers and Paperworkers v. United States] the court said, 416 F.2d [980] at 989:

'When an employer or union has discriminated in the past and when its present policies renew or exaggerate discriminatory effects, those policies must yield, unless there is an overriding legitimate non-racial business purpose.'

"The Fourth Circuit, in Griggs v. Duke Power Company, supra, (420 F. 2d 1225 reversed in part, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158, discussed later in this memorandum) went further.

"Although it found that the employer's educational and testing require-ments served a genuine business purpose, the court held that these requirements must be waived as to those Negroes who were locked in by a combination of the requirements and discriminatory hiring practices. * * * We believe that the issues with which we are concerned are not affected by the grant of certiorari in Duke. * *

"The remedial nature of Title VII requires the adoption of the business necessity test. If employers or unions could pursue, upon a showing of mere rationality, neutral policies which have the effect of perpetuating past discrimination, the value of the principles developed in Quarles and subsequent cases would be eroded. When a policy is demonstrated to have discriminatory effects, it can be justified only by a showing that it is necessary to the safe and efficient operation of the business."

In the determination of this case, it is vitally important that careful consideration be given to Griggs v. Duke Power Company, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158, decided March 8, 1971. The question in Griggs, as stated by Chief Justice Burger, was:

"Whether an employer is prohibited by the Civil Rights Act of 1964, Title VII, from requiring a high school education or passing of a standardized general intelligence test as a condition of employment in or transfer to jobs when (a) neither standard is shown to be significantly related to successful job performance, (b) both requirements operate to disqualify Negroes at a substantially higher rate than white applicants, and (c) the jobs in question formerly had been filled only by white employees as part of a long standing practice of giving preference to whites."

The Court held that when the standards were not shown to be significantly related to job performance, when they were shown to disqualify Negroes at a substantially higher rate, and when the jobs in question had formerly been filled

by white employees as part of a long standing discriminatory practice, such tests were invalid and could not be relied upon to effectuate discrimination. The Court said:

"In short, the Act does not command that any person be hired simply because he was formerly the subject of discrimination, or because he is a member of a minority group. Discriminatory preference for any group, minority or majority, is precisely and only what Congress has proscribed. What is required by Congress is the removal of artificial, arbitrary, and unnecessary barriers to employment when the barriers operate invidiously to discriminate on the basis of racial or other impermissible classification.

"Congress has now provided that tests or criteria for employment or promotion may not provide equality of opportunity only in the sense of the fabled offer of milk to the stork and the fox. On the contrary, Congress has now required that the posture and condition of the job seeker be taken into account. It has—to resort again to the fable—provided that the vessel in which the milk is proffered be one all seekers can use. The Act proscribes not only over discrimination but also practices that are fair in form, but discriminatory in operation. The touchstone is business necessity. If an employment practice which operates to exclude Negroes cannot be shown to be related to job performance, the practice is prohibited.

"On the record before us, neither the high school completion requirement nor the general intelligence test is shown to bear a demonstrable relationship to successful performance of the jobs for which it was used. Both were adopted, as the Court of Appeals noted, without meaningful study of their relationship to job-performance ability. Rather, a vice president of the Company testified, the requirements were instituted on the Company's judgment that they generally would improve the overall quality of the work force.

"The evidence, however, shows that employees who have not completed high school or taken the tests have continued to perform satisfactorily and make progress in departments for which the high school and test criteria are now used. * * *

"The Court of Appeals held that the Company had adopted the diploma and test requirements without any 'intention to discriminate against Negro employees.' We do not suggest that either the District Court or the Court of Appeals erred in examining the employer's intent; but good intent or absence of discriminatory intent does not redeem employment procedures or testing mechanisms that operate as 'built-in headwinds' for minority groups and are unrelated to measuring job capabilities.

"The Company's lack of discriminatory intent is suggested by special efforts to help the under-educated employees through Company financing of two-thirds the cost of tuition for high school training. But Congress directed the thrust of the Act to the *consequences* of employment practices, not simply the motivation. *More than that, Congress has placed on the employer the burden of showing that any given requirement must have a manifest relationship to the employment in question.*

[The Court then discusses the Legislative history of the permissive testing sections of the Act, and concludes:]

"Nothing in the Act precludes the use of testing or measuring procedures; obviously they are useful. What Congress has forbidden is giving these devices and mechanisms controlling force unless they are demonstrably a reasonable measure of job performance. *Congress has not commanded that the less qualified be preferred over the better qualified simply because of minority origins. Far from disparaging job qualifications as such,*

*Congress has made such qualifications the controlling factor, so that race, religion, nationality, and sex become irrelevant. What Congress has commanded is that any tests used must measure the person for the job and not the person in the abstract."*

Lastly, mention should be made of 29 C.F.R. § 1607.5(c) (iii). That subsection, which deals with the validity of testing procedures, provides:

"The smaller the economic and human risks involved in hiring an unqualified applicant relative to the risks entailed in rejecting a qualified applicant, the greater the relationship needs to be in order to be practically useful. Conversely, a relatively low relationship may prove useful when the former risks are relatively high."

Statistical studies made by United establish that there is indeed a direct and substantial correlation between successful completion of the training program and a college degree, especially when that degree is in science related areas. United admits that this is the least important of its qualifications and that the degree requirement is occasionally waived when the more important qualification of flight time is particularly good. The statistical studies demonstrate a close correlation between flight time and the quality of flight time and success in job performance. Most certainly, there is no affirmative showing of an intent on the part of United to discriminate, but, as noted in *Griggs*, the test is not one of intent, but, rather, "Congress has placed on the employer the burden of showing that any given requirement must have a manifest relationship to the employment in question." United has clearly met that burden here. Exhibit H demonstrates a uniform application of United's rules as to flight officer qualifications. *Griggs* reminds that "Congress has not commanded that the less qualified be preferred over the better qualified simply because of minority origins." To grant plaintiff the relief he here seeks would be to violate that reminder.

In summary, then, the Court finds and concludes:

1. There has been no proof of an intent on the part of United to discriminate in its employment of flight officers.

2. It has been proven that the job qualifications and testing procedures established by United are fair and reasonable; that they are uniformly applied without reference to race; that they do not accomplish discrimination in fact and that they are job related.

As was noted earlier, plaintiff recognizes United's right to establish testing procedures, and plaintiff's present claim is one of a right to take and either pass or fail the further tests. This would create a difficult if not impossible situation for the Court should such a rule be announced. The logical next step would be to say that an applicant could not be failed in the school anywhere along the way, but that he was entitled to complete the school no matter how poorly he was doing. Neither *Griggs* nor any other case suggests such a result. The mandate of *Griggs* has been met here by United.

Plaintiff's complaint is ordered dismissed.