Jessie L. COLLINS and Daniel T. Pedraza, Sr., et al., Plaintiffs.

v.

UNION CARBIDE CORPORATION CHEMICAL DIVISION, LOCAL 347 INTERNATIONAL UNION OF OPERATING ENGINEERS, AFL–CIO, and Texas City, Texas Metal Trades Council, AFL–CIO, Defendants.

Civ. A. No. 69–G–184.

United States District Court,
S. D. Texas,
Galveston Division.

Feb. 21, 1974.

See also, D.C., 52 F.R.D. 208.

Gabrielle K. McDonald, McDonald & McDonald, Houston, Tex., for plaintiffs.

William N. Wheat, Houston, Tex., for defendant Texas Metal Trades Council.

V. Reagan Burch, Jr., Baker & Botts, Houston, Tex., for defendant Union Carbide Corp.

## MEMORANDUM AND ORDER

NOEL, District Judge.

Plaintiffs Jessie L. Collins, a Negro, and Daniel T. Pedraza, Sr., a Mexican-American, brought suit against Union Carbide Corporation Chemical Division (hereinafter Company), Texas City, Texas Metal Trades Council, AFL–CIO (hereinafter Union), and Local 347, International Union of Operating Engineers, AFL–CIO. Plaintiffs allege violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and of 42 U.S.C. § 1981 in the operation of Company's Texas City, Texas plant.

Nine individual Negro employees subsequently intervened as plaintiffs. Because the collective bargaining relationship exists solely between Company and Union, Local 347 was not a party to the alleged discrimination. Accordingly, the action against defendant Local 347 was dismissed on April 7, 1971.

After considerable discovery, extensive negotiation, and numerous pretrial reports, the parties agreed to a Consent Order which the Court signed and entered April 5, 1972. The Order enjoins future violation of Title VII and contains a finding that this case is properly maintainable as a class action. Fed.R. Civ.P. 23. The class is defined as "all black and Mexican-American persons who were employed by or had recall rights with the Company as of April 4, 1972, and were represented for the purposes of collective bargaining by the Council, and who were initially placed in the Labor Group." Persons within such class as such are hereinafter called "class members." The Order provides prompt transfer of approximately 25% of the class members into work units of their choice at top pay rates (another 25% had already transferred). Under the terms of the Order, newly transferred employees undergo the regular on-the-job and supplemental classroom training required for the position. Any supplemental training is for purposes of instruction but not for evaluation. For jobs requiring apprenticeships, the usual age requirement was waived with respect to members of the class. Finally, it provides for liquidated damages, plaintiffs' attorneys fees, and court costs to be paid by defendants.

On November 8, 1972 the parties stipulated that all issues were resolved except one. The remaining issue is "What remedial seniority rights, if any, should be established for plaintiffs and the class of represented employees defined in the Consent Order." The parties stipulated to uncontested facts relating to that issue.

A trial to the Court was held December 13 and 15, 1972 and June 29, 1973. A transcript of the proceedings was prepared and submitted for the parties' use on October 29, 1973. All parties have submitted briefs and the vestigial issue is ripe for disposition.

Although singular, the contested issue is complex, requiring exposition of employee organization and seniority rules,

both past and present, within Company's plant.

Employees at Company's Texas City plant are generally organized horizontally, with employees categorized by skill and function. Workers are divided into numerous work units called crafts and groups. The sixteen crafts contain generally more skilled and more highly paid workers than the twelve groups. Employee seniority is determined within each group or craft. Each employee's seniority is set by service within his work unit, without consideration to time spent in other groups or crafts within the plant.

This organizational scheme is utilized because each work unit generally involves distinct skills, abilities and procedures which are not readily transferable to other positions. This system also encourages professionalism within each craft or group.

An individual's seniority is significant for three purposes. The most senior employee within each craft or group is designated leadman. He has supervisory and administrative responsibility over other men, and receives higher wages. Secondly, seniority governs reductions in force. Layoffs within each work unit occur in inverse order of seniority. Finally, vacation and shift preferences are allocated on the basis of seniority. Except for leadmen and for novice workers who have not completed the applicable training program, the wage rate is the same for all workers working the same shift within a particular work unit. Thus, for most employees, seniority has little effect on pay.

Prior to 1967, each craft and group within the plant was treated separately for purposes of hiring as well as for the purpose of seniority. Prior service in other crafts or groups within the plant was not considered. Accordingly, employees generally were hired into a particular work unit and did not usually transfer from one group to another.

The lowest paid work unit is the Labor Group. Employees in Labor work throughout the plant at a variety of functions. Some perform general janitorial duties in the plant, others do support work for members of other groups or crafts. Prior to 1967, the Labor Group was treated like any other group and there was little or no transferring out of Labor into other groups or crafts.

Beginning September 20, 1967, at the suggestion of the Atomic Energy Commission and as a means of complying with the Civil Rights Act, 42 U.S.C. § 2000e et seq., Company changed its hiring procedures. Laborer became the entry level job for positions in other groups and crafts throughout the plant. New employees usually began work in the Labor Group. Qualified applicants from the Labor Group filled vacancies in other crafts and groups in preference to those who were not then employed by Company.

The transferring worker's seniority in the new group or craft was still computed by his service within that work unit. However, to encourage transfers, Company allowed a laborer transferring into another unit to retain his seniority in the Labor Group for purposes of securing reemployment in the Labor Group. If a reduction in force occurred, or if the working situation in the new unit was unsatisfactory, he could use his retained seniority to transfer back into the Labor Group. Thus, a laborer with considerable seniority did not risk unemployment by transferring. Retained seniority in a prior work unit applied to all transferring employees.

Company and Union began an apprenticeship program for all crafts in 1951. Beginning in 1955, a high school diploma or its equivalent was required for entry into apprenticeship programs. A greater percentage of Negro employees than White employees do not have a high school diploma or its equivalent. The educational requirement was never validated in accordance with Equal Employment Opportunity Commission (EEOC) guidelines. On May 14, 1971 while this litigation was pending, the Company abandoned the educational requirement.

In 1951, Company also began administering tests to applicants for craft positions. Beginning in 1955, the tests were extended to applicants for group jobs. Test scores were a factor in employment decisions. From 1965 through 1971, the average score of black employees was significantly lower than the average score for Whites. The tests used by Company were never validated within the meaning of EEOC guidelines. The Company also discontinued tests on May 14, 1971.

Prior to the 1967 changes made at the AEC's suggestion, the Labor Group was treated separately for hiring purposes. On July 2, 1965 for example, the Labor Group was composed entirely of Negroes. Of the eleven other groups, only three (tool room attendants, general helpers, and truck drivers) contained Negroes. In each, Negroes constituted a small minority. Thirteen of sixteen crafts contained only white employees on July 2, 1965. The other three crafts (carpenter, machinist and painter) each contained one Negro. No Mexican-Americans were employed at the plant on July 2, 1965. The first Mexican-American worker was hired May 24, 1966.

As a result of hiring policies initiated in 1967, the percentage of Negroes and Mexican-Americans in the crafts increased. Nonetheless, as of April 15, 1971, Negroes had never been employed in five of sixteen crafts (no one was hired since 1965 in a sixth craft). In six other crafts, 17% or less of newly hired were Negro or Mexican-American. Although more Negroes and Mexican-Americans were hired into groups, one group was still composed entirely of White workers. In the largest group, only 20 out of 210 new employees were Negro or Mexican-American.

By way of comparison, the Houston area population is composed of approximately 24% Negro, 8% Mexican-American, and 68% White. Johnson v. Goodyear Tire & Rubber Co., 349 F.Supp. 3, 13 (S.D.Tex.1972).

With respect to the contested seniority issue, plaintiffs contend that each class member transferring from the Labor Group to another group or craft should immediately receive remedial seniority in the new work unit equal to his service in the plant. Seniority would be computed as if the employee had worked in his new craft or group the entire time he had been at the plant.

Defendants Company and Union contend class members are not entitled to remedial seniority. Alternatively, defendants argue, if remedial seniority is to be provided, an employee should not be entitled to exercise the seniority until he has served in his new group or craft for a residency period equal to the applicable apprenticeship or training period for that work unit. Defendants also assert that no class member should retain seniority in the Labor Group after receiving remedial seniority credit in another group or craft.

The parties agree that any Court ordered remedial seniority will be subject to certain conditions. Remedial seniority would only apply to the first craft or group into which the employee transfers from the Labor Group. Subsequent transfers would be governed solely by the collective bargaining contract. A class member could not utilize remedial seniority to defeat an employee whose plant seniority equalled or exceeded his own. Finally, seniority for a few named plaintiffs was set in the Consent Order or the stipulation and will not be affected by the Court's decision.

By its terms, Title VII applies prospectively to employment discrimination occurring after the statute's effective date (July 2, 1965 for employers with 100 or more employees). United States v. Jacksonville Terminal Co., 451 F.2d 418, 450 (5th Cir. 1971), cert. denied, 406 U.S. 906, 92 S.Ct. 1607, 31 L.Ed.2d 815 (1972); 42 U.S.C. § 2000e(b). Nonetheless, present employment practices, including seniority systems, which preserve and continue the effects of pre-Act discrimination consti-

tute present, ongoing discrimination and as such are prohibited. Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); Local 189, United Papermakers & Paperworkers v. United States, 416 F.2d 980 (5th Cir. 1969), cert. denied, 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 100 (1970). It is irrelevant that such practices may be superficially neutral, Jones v. Lee Way Motor Freight, Inc., 431 F.2d 245 (10th Cir. 1970), or exist absent a present intent to discriminate, Rowe v. General Motors Corp., 457 F.2d 348 (5th Cir. 1972). Only if the present practice is essential to an overriding, legitimate, non-racial business purpose, such as safety and efficiency, can the policy in question be allowed to stand. *Local 189,* supra. So far as possible, the present effects of past discrimination must be eliminated. Long v. Georgia Kraft Co., 450 F.2d 557, 561 (5th Cir. 1971). When opportunities arise, the victims of former discrimination must be able to take their "rightful place" within the work force. Developments in the Law—Employment Discrimination and Title VII of the Civil Rights Act of 1964, 84 Harv.L.Rev. 1109, 1154–66 (1971).

■ If it is established that discrimination occurred in the Past, the inquiry into present practices is two-fold: (1) does the present policy perpetuate the past discrimination and, (2) is the present policy justified by a showing of business necessity. Bing v. Roadway Express Inc., 444 F.2d 687 (5th Cir. 1971).

Prior to September 15, 1965 almost all Negroes were hired into the Labor Group and all Whites went into other groups and crafts. No Mexican-Americans were hired prior to 1966. These practices constitute obvious disparity of employment opportunity. Parham v. Southwestern Bell Telephone Co., 433 F. 2d 421 (8th Cir. 1970).

Neither Company nor Union seriously contend that race was not a factor in hiring procedures prior to 1965. They argue that such discrimination ended September 15, 1965, when the first White employee was hired into the Labor Group. Thereafter, in 1967, the Labor Group became a hiring pool. Most White and Negro employees were initially hired as laborers. Most new employees for other groups and crafts were drawn from the ranks of qualified applicants in the Labor Group.

■ Nevertheless, applicants were qualified for other work units on the basis of company-sponsored tests which were not EEOC validated as being job related. This Court has elsewhere expressed the view that, absent hostile motives, employers should have considerable latitude in use of tests to evaluate or predict job performance. Gay v. Wheeler, 363 F.Supp. 764 (S.D.Tex.1973). Nevertheless, the law in the area of industrial relations is clear. Such tests can only be utilized if "they are demonstrably a reasonable measure of job performance." Griggs v. Duke Power Co., supra 401 U.S. at 436, 91 S.Ct. at 856. Defendants stipulate the tests had not been validated as job related. Nor did defendants attempt to demonstrate their validity to the Court.

■ The parties have agreed the average score of Negro employees on the tests was significantly lower than the average score of White employees. It is also undisputed that Negroes and Mexican-Americans continued to be underrepresented in non-labor groups and crafts. The Court concludes that use of non-validated tests in evaluating applicants had a discriminatory effect on job transfers within the plant. Compare Johnson v. Goodyear Tire & Rubber Co., 349 F. Supp. 3 (S.D.Tex.1972). Apparently, Company itself believed use of the tests was improper because on May 14, 1971, Company advised Union it did not consider the tests valid under recent court decisions and would no longer administer them. See Bernhardt, Griggs v. Duke Power Co.: The Implication for Private and Public Employees, 50 Tex. L.Rev. 901 (1972).

Plaintiffs submitted considerable statistical data to support allegations of discrimination. Statistical evidence has been important in Title VII litigation. E. g., Brown v. Gaston County Dyeing Machine Co., 457 F.2d 1377 (4th Cir. 1972); United States v. Hayes International Corp., 415 F.2d 1038, 1043 (5th Cir. 1969).

Use of statistics may obviate the need for lengthy and difficult inquiry into personal bias or prejudice. Nonetheless, such evidence, standing alone, may support multiple inferences and remain unpersuasive. Ochoa v. Monsanto Co., 335 F.Supp. 53 (S.D.Tex.1971), aff'd, 473 F.2d 318 (5th Cir. 1973). In this case, however, defendants admit use of non-validated tests. The statistics presented merely demonstrate the effect of company's practices on minority employees.

■ The next inquiry is whether present employment policies perpetuate past discrimination. The policy here in question is the seniority system which treats each craft and group separately. The decision not to count service in other work units for purposes of seniority is superficially neutral; it applies to all employees regardless of race. Nevertheless it operates to freeze those subjected to past discrimination into inferior positions. Bing v. Roadway Express Inc., supra; Jones v. Lee Way Motor Freight Inc., supra; United States v. Sheet Metal Workers International Association. Local 36, 416 F.2d 123 (8th Cir. 1969).

■ Prior to 1971, minority entry into higher paying groups and crafts was obstructed by the discriminatory hiring and transfer policies. Accordingly, those Negroes and Mexican-Americans hired during this period were restricted to the Labor Group. Having only recently moved into other positions, these minority workers have less seniority than contemporaneously hired Whites whose entry into non-labor groups was not restricted. This lower seniority is a "present effect of past discrimination" and must be corrected "so far as possible." Long v. Georgia Kraft Co., supra.

■ To resolve the problem, plaintiffs seek remedial seniority credit in the new work unit equal to the employee's service in the plant. This proposal assumes that each class member would have entered a particular craft or group the day he began working at the plant and remained there without interruption. Although somewhat arbitrary, the presumption is not unreasonable. Compare, Bing v. Roadway Express, Inc., 485 F.2d 441, 450 (5th Cir. 1973). See Developments in the Law, supra at 1163; Note, Title VII, Seniority Discrimination and the Incumbent Negro, 80 Harv.L.Rev. 1260, 1276 (1967).

Defendants do not admit the present system is unfair. Nevertheless neither Company nor Union seriously contests the facts presented by plaintiffs or the conclusion that the seniority system operates to continue former policies. Neither defendant has attempted to justify the unfairness. Nor does either defendant strongly oppose remedial seniority as an eventual remedy.

Both Company and Union contend, however, that remedial seniority should not vest immediately with each employee but should await his completion of a residency period. If remedial seniority is appropriate, both Union and Company maintain, it should not be provided unless and until the individual has worked in his new unit for a period equivalent to the usual period of apprenticeship or other training for that craft or group. Depending upon the job, the proposed residency periods range from three months to four years in length.

Defendants' contention raises the second branch of the Bing inquiry: whether denial of rights is justified as essential to a necessary, non-discriminatory business purpose. This standard must be met before postponement of remedial seniority can be allowed.

Defendants contend delay of remedial seniority is required to insure skilled and knowledgeable employees. As mentioned above, seniority is used to determine who will be leadman, and who will

remain working when layoffs occur. Defendants maintain that if remedial seniority is granted immediately, a senior but inexperienced transferee could claim a vacant leadman position in preference to an experienced but less senior craftsman. Defendants argue that a leadman who has not completed the training program in the craft or group would be detrimental to safety and efficiency.

Similarly, defendants point out, in the event of a layoff, under plaintiffs' plan, work units could lose experienced workers while inexperienced transferees remain; that the transferees might constitute a majority or more of remaining workers in a work unit. Defendants contend such would be unacceptable.

Obviously, not all class members have sufficient plant seniority to challenge experienced workers in other work units. However, the evidence demonstrates that approximately 50 former members of the Labor Group have more than 20 years service at the plant; and that although all class members have not chosen a new craft or group, those who have already transferred constitute a majority of senior workers in several groups and crafts. Thusly, defendants' forecast of takeover of leadman positions and majorities in work units is factually based.

The record demonstrates that Company's Texas City plant is a modern complex facility. Highly trained, effective workers are essential to efficient and profitable production and employee safety.

The critical question is whether, under the evidence presented and the entire record, senior class members are already qualified by previous experience to be leadmen or to work independently in the event of a reduction in force, or if they must await completion of additional training before becoming so qualified. Based on the evidence presented, the Court finds and concludes that such senior class members are not so qualified. Additional training is necessary to fully prepare them for new responsibilities as leadmen and to work independently.

The testimony of plaintiffs and other class members demonstrates the necessity for specialized instruction and organized exposure to various work situations. Each witness, a recent transferee into a craft or non-labor group, had worked as "serving labor" to the same unit for several years. During those years, each witness performed many routine tasks which craftsmen perform. Nevertheless, in each case, and despite years of observation, casual training, recent work within the unit, each witness admitted he had not performed certain important tasks or become familiar with particular procedures. Absent regularized training, even workers exposed to a craft's operation were not sufficiently familiar with the job. And many class members will transfer into less familiar situations.

The apprenticeship and on-the-job training programs are specifically designed to meet this problem. They provide exposure to work problems and instruction to prepare workers to meet all work situations. Features of such programs which unfairly discriminated were eliminated either by the company unilaterally in 1971, or by the Consent Order. It is obvious that class members need the usual job training before they will be fully qualified in their jobs.

██ The Court finds and concludes that for purposes of determining the leadman and for layoff retention, delaying remedial seniority until completion of the applicable training program is reasonably necessary to the legitimate goals of a trained and capable work force. Accordingly, that delay will be ordered.

██ In terms of shift and vacation preferences, immediate remedial seniority will not thwart any reasonable business purpose. Accordingly, no delay will be allowed in this respect.

The final issue relates to retained seniority. Presently, all transferring em-

ployees retain seniority credit in their former craft or group. Defendants Company and Union object to continued application of retained seniority to class members who receive remedial seniority. They argue that such would allow double counting of seniority time. Retention would permit counting service in the first unit as remedial seniority in the second craft or group, and also as retained seniority in the first craft or group. Defendants urge termination of a class member's retained seniority in his former group upon his obtaining remedial seniority in the new work unit.

Plaintiffs oppose defendants' proposal. They argue that retained seniority is a contract right applicable to all employees; and that denial of that right to class members would constitute discrimination without a valid business justification.

■■■ Under the Civil Rights Act, the differentiation proposed by defendants may only be allowed if necessary to a valid business purpose. See Long v. Georgia Kraft Co., supra. Defendants have not demonstrated a valid purpose thereby to be served.

Both Company and Union express a strong philosophical objection to "double" seniority as unheard of in this plant. Defendants' philosophical objection does not constitute a legitimate business objection. Unprecedented results are characteristic of Title VII litigation. See Peters v. Missouri-Pacific R. R. Co., 483 F.2d 490 (5th Cir. 1973).

■■■ Union presented testimony suggesting if class members receive both remedial and retained seniority, other workers will demand plant seniority for all purposes. This, the Union contends would seriously endanger the craft system.

Were this a real danger, it might justify terminating retained seniority for class members. Contra, United States v. Bethlehem Steel Corp., 446 F.2d 652, 662 (2nd Cir. 1971). Nonetheless, under the Court's decision herein, it is doubtful the result feared by Union will occur.

The Court has determined that remedial seniority for purposes of layoffs and the leadman positions will vest only upon successful completion of the appropriate training period. Only class members who have fully qualified in the new work unit will have "double" seniority. These workers, who have the security of remedial seniority, will have little need or desire to use retained seniority to return to the lower paying Labor Group. It is doubtful that the few instances in which retained seniority might be used by a worker who has remedial seniority will lead to widespread employee demand for plantwide seniority. The retained seniority system will be left undisturbed by the Court.

In conclusion, the Court holds, inter alia, that: all Negroes and Mexican-Americans who were employed by or who had recall rights with Company on May 14, 1971 were subjected to unlawfully discriminatory employment practices; the present seniority system unjustifiably perpetuates such practices; granting remedial seniority equal to plant seniority to the affected class members is an appropriate remedy; nonetheless, for purposes of designating leadmen and retaining employees in the event of layoffs, the applicable remedial seniority will not vest until the worker has completed the appropriate apprenticeship or on-the-job training; for purposes of vacation and shift preference, remedial seniority shall vest within ten (10) days of entry of a final decree; and, that the retained seniority system is a contractual matter which will not be altered by the Court.

The foregoing constitutes the Court's findings of fact and conclusions of law. Fed.R.Civ.P. 52.

Counsel shall prepare and submit an appropriate judgment consistent with this Memorandum within thirty (30) days, to be effective ten (10) days after entry, unless otherwise stayed.

The Clerk shall file this Memorandum and Order and furnish a copy to all counsel.