Alfred OCHOA, Plaintiff,

v.

MONSANTO COMPANY, Defendant.

Civ. A. No. 70-G-26.

United States District Court,
S. D. Texas,
Galveston Division.

Nov. 26, 1971.

Gabrielle K. McDonald, Houston, Tex., Jim Heidelberg, San Antonio, Tex., for plaintiff.

Tom M. Davis, Houston, Tex., for defendant.

## MEMORANDUM AND ORDER

NOEL, District Judge.

Following rejection of his application for employment and exhaustion of his administrative remedies, plaintiff Alfred Ochoa brought this suit pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., against Monsanto Company (hereafter Monsanto) seeking relief individually and on behalf of Mexican-Americans as a class from the defendant's alleged discrimination on the basis of national origin in employment practices at its Chocolate Bayou chemical plant near Alvin, Texas. The cause came on for trial on October 19 and 20, 1971, and the Court now enters findings of fact and conclusions of law. Rule 52, Fed.R.Civ.P.

### Findings of Fact

(1) Plaintiff is a Mexican-American citizen of the United States and presently resides in Texas City, Texas. He is a high school graduate and has attended two years of college. He served in the United States Air Force from 1953 to 1957 where he performed clerical duties. For the decade following 1957, he worked for the Southern Pacific Company and was in charge of railroad yard operations in Galveston, Texas, when he was terminated due to the phasing out of his job in 1967.

(2) Being unemployed, plaintiff was looking for a job during the latter part of 1967. He was, at the time, receiving termination benefits from the railroad which would continue for a period of six months on condition that he actively sought another job during that period. On September 7, 1967, plaintiff applied for employment at defendant's Chocolate Bayou plant. His application was examined and classified into the processing department, which is a job category designating those workers who perform the general tasks necessary to operation of this highly automated chemical plant. Having completed an employment application form, plaintiff was told to return for a written examination on October 5, 1967. This he did, and was informed immediately thereafter that he had passed the test. He was then administered a personal interview by Mr. K. R. Oppermann, Monsanto's personnel offi-

cer in charge of recruitment and employment at the plant. Mr. Oppermann's reaction to plaintiff as a potential employee was unfavorable and was expressed in his interview memorandum as follows:

Very neat, personable, good talker. Al has been out of work since last May. He is more concerned with just applying with cos. (companies) so as to collect unemployment pay than getting a job. Basically lazy. We can do better.

(3) Monsanto's handling of plaintiff's application was consistent with the company's usual practice. The normal sequence of events was as follows: (a) filing of the application; (b) classification of the application by department on the basis of age, education, and physical ability as revealed on the form, (c) administration of the written test, (d) interview with Mr. Oppermann, and (e) interviews with two or more supervisors in the department to which the applicant would be assigned if hired. Failure to pass scrutiny at any stage of this screening procedure resulted in rejection of the application and termination of the procedure at that stage.

(4) In plaintiff's case, the rejection resulted from an evaluative judgment on the part of Mr. Oppermann. In the interviews upon which Oppermann based his judgments, it was his practice to first attempt to establish a conversational rapport with the interviewees. He would then inquire about educational and employment backgrounds, as well as attitudes toward shift work and round-the-clock hours. Plaintiff testified that Oppermann's interview appeared calculated to discourage his application, in that the interviewer spoke of hundreds of other applications, emphasized the unconventional hours, and queried plaintiff about his willingness to drive thirty miles to work from his home in Galveston as well as the attitude his family might take toward this necessity. The Court finds Oppermann's testimony about his interviewing procedure to be credible, that the interview was conducted in a businesslike manner and was limited to subject matter relevant to prospective employment. To the extent that the interviewer pointed out negative aspects of the job, this was standard procedure and the only motive was commendable candor in describing the nature of the available work. This procedure was misinterpreted by plaintiff as being biased and intentional discouragement by Oppermann. On the basis of Oppermann's testimony and demeanor, the Court finds that his unfavorable appraisal of plaintiff's employment potential derived from his neutral character judgment as an experienced personnel administrator. Whether or not Oppermann's assessment of plaintiff was correct is not before the Court; however, it is clear that it did not result from racial or national origin prejudice, and the Court so finds.

(5) Defendant promptly sent a letter to plaintiff informing him that he had not been selected for employment. Due to a mistaken digit in the address number, plaintiff never received the letter.

(6) Plaintiff's application procedure was terminated by the Oppermann interview. As a practical matter, such a decision by Oppermann was unreviewable within the hierarchy of the company's personnel department. Accordingly, since he acted decisively for defendant in regard to Ochoa, Oppermann's demonstrated attitude toward the employment of Mexican-Americans takes on considerable relevance to this lawsuit. There is evidence in the record on the point. On October 17, 1966, Oppermann visited an employment service in Houston for the purpose of soliciting referrals of qualified minority group applicants, specifically Negroes and Mexican-Americans. (See defendant's exhibit 26). Also, during 1967 and 1968, Oppermann wrote several letters to Mexican-American job candidates inviting them to visit the plant at defendant's expense for interviews, (see defendant's exhibit 28), and contacted leading members of the Alvin and Galveston Mexican-American communities soliciting employment ap-

plications. (See defendant's exhibit 12.) One of these prominent Mexican-Americans, Mr. Frank Carmona, testified that Oppermann had spoken to him about the matter on several occasions, possibly as early as 1967, and that it was Mr. Carmona who advised plaintiff to apply at defendant's plant. Oppermann also urged present Mexican-American employees to encourage other Mexican-Americans among their acquaintances to apply for employment. In addition to these measures, Oppermann visited three predominantly Mexican-American junior colleges during February of 1968 in an effort to attract job applicants. Taken together, these efforts of Mr. Oppermann on behalf of his employer indicate that defendant was actively seeking qualified Mexican-American employees, an inference which is obviously inconsistent with the allegations of racial and national origin prejudice.

(7) Besides Ochoa, one other unsuccessful Mexican-American job applicant was produced at trial. Oracio Carreon made his application on September 9, 1967, and was soon thereafter invited to appear for the pre-employment tests. On two appointed occasions he failed to report for the testing, but finally did take the test over a year later. Upon passing the test, he was interviewed by Oppermann, and the subject matter of this conversation was similar to that described in finding 4, supra. Having received Opperman's reluctant approval, Carreon proceeded to the final stage of the screening process, where he failed to impress two of the three supervisors with whom he spoke, and he was promptly notified that he would not be employed. At the time, Carreon did not feel that he had been discriminated against. Indeed, there is no credible evidence to suggest that defendant's action in regard to this witness was motivated by racial or national origin prejudice and the Court accordingly finds that it was not so motivated.

(8) Monsanto has never maintained employee facilities at Chocolate Bayou which were segregated by race or national origin. All dining rooms, washrooms, toilets, and similar facilities have been fully integrated from the inception of the plant. There is no perceivable de facto segregation by job classification. Defendant did not and does not now employ manual laborers, janitors, or kitchen help, as these functions are performed by independent contractors.

(9) The Chocolate Bayou plant began production in 1962 and drew its original labor force from approximately 10,000 job applicants. Among the first persons hired was a Mexican-American who accepted a job in the processing department which he still holds. From March of 1962, when the first Mexican-American was hired, until plaintiff's application in 1967, defendant hired seven Mexican-Americans: two engineers, two laboratory analysts, a laboratory helper, an accounting clerk, and a stenographic clerk.

(10) During the period from April 1, 1967, to April 1, 1968, (approximately six months before and six months after plaintiff's application and the alleged act of discrimination), defendant's Chocolate Bayou plant received employment applications from 684 persons, including 653 Anglos, 20 Negroes and 11 Mexican-Americans. Of these applicants, 56 persons, including one Mexican-American, were hired. Therefore, it appears that defendant hired a greater percentage of Mexican-American applicants (9.09%) than of other applicants (8.17%). During this same period of time, defendant's work force varied in strength from 662 to 745, and its Mexican-American contingent varied from 5 to 7. Of these, one Mexican-American worked in the processing department, which was composed of approximately 225 persons.

(11) After plaintiff's application was rejected, yet before the time that defendant knew of plaintiff's discrimination charge, defendant hired ten additional Mexican-Americans for jobs at

Chocolate Bayou. By the time of trial, 32 Mexican-Americans were employed at the plant in various capacities, including 13 in the processing department.

(12) Although evidence of announced laudatory intentions is obviously not by itself dispositive in Title VII cases, such evidence is relevant and may be accorded cumulative weight on the issue of an employer's good faith, which in turn becomes material when an intentional policy of discrimination is alleged. In the instant case, there is evidence of at least a decade of effort on the part of Monsanto to follow non-discriminatory employment practices at the Chocolate Bayou plant.

(a) In 1962, Monsanto entered into an agreement known as "Plans for Progress" with the President's Committee on Equal Employment Opportunity. The company's participation in this program, and the actions required to achieve compliance, were publicized throughout the organization. (See defendant's exhibit 23 and attachments.) For example, the July 31, 1963, issue of the Chocolate Bayou plant newspaper carried the following statement of policy by the company's president:

"We believe that the determining factor in hiring and placing employees are the requirements of the specific job and the qualifications of the individual. It is Monsanto's policy to treat applicants equally, without regard to race, color, creed, national origin, religion, or political preference." This policy has been and will continue to be followed at Chocolate Bayou.

(b) The company's employee handbook has contained a similar statement at least since 1963. Similarly, "equal opportunity" posters have been placed at appropriate points throughout the Chocolate Bayou facility, and have been included in all help-wanted advertising for the plant. The plant's policy in this regard has been widely communicated to the employees through the medium of meetings. Implementation of the policy has been the subject of various intra-management memoranda at the plant, as well as policy directives from corporate headquarters. (See defendant's exhibits 22 and 23 and attachments.)

(c) Monsanto's Chocolate Bayou plant has in past years contracted to do work for the Atomic Energy Commission, and has accordingly been sensitive to the requirements of certain Executive Orders relating to discrimination by government contractors. The initial tone which the Commission gave to this program was the expansion of Negro employment, (see defendant's exhibit 29), although the emphasis was changed to include Mexican-American recruitment in 1967. (See defendant's exhibit 12.) Some of the company's efforts in this connection are described in finding of fact 6, supra.

On the basis of the many manifestations of corporate intent which are contained in this record and which are outlined above, the Court finds that defendant has long recognized its duty to conduct its employment practices in a non-discriminatory manner. The record here reflects that it sought with diligence and good faith to perform that duty, in its processing of plaintiff's application for employment.

### Conclusions of Law

I. Plaintiff has properly exhausted his administrative remedies; this Court has jurisdiction over the parties and of the subject matter. 42 U.S.C. § 2000e–5 (f). Defendant is an employer within the meaning of 42 U.S.C. § 2000e(b).

II. At the request of both parties, the Court concludes that this suit is properly maintainable as a class action. Rule 23(b) (2), Fed.R.Civ.P.

III. Plaintiff vigorously urges that he is entitled to prevail solely on the basis of the statistics set out in finding of fact 10, supra, to wit: that defendant employed only 5 to 7 Mexican-

Americans, only one of whom was a processor, between the springs of 1967 and 1968, and hired only one of eleven Mexican-American applicants during that period. In support of this proposition, reliance is placed on Parham v. Southwestern Bell Telephone Company, 433 F.2d 421 (8th Cir. 1970), in which the Court of Appeals for the Eighth Circuit stated that statistics such as those offered in that case established a Title VII violation as a matter of law. If taken as a statement of general application, this proposition is subject to qualification.

As an analytical tool for ferreting out the presence of impermissible classifications, statistical data has traditionally been received as useful and probative evidence in racial discrimination cases. This reliance is grounded on the plausible observation that a large and unexplained disparity between the proportion of a particular racial group in any selected category and the proportion of that racial group in the relevant population is unlikely to result from a racially neutral process of selection. See M. O. Finkelstein, The Application of Statistical Decision Theory to the Jury Discrimination Cases, 80 Harv.L.Rev. 338 (1966); Note, An American Legal Dilemma—Proof of Discrimination, 17 U. Chi.L.Rev. 107 (1949), quoted at Sovern, Racial Discrimination in Employment, Cases and Materials on Law and Poverty 521 (1969).

Such evidence, although probative, is not conclusive. In a leading school desegregation case, a manifest variance between the proportion of Negro school children attending school with whites and the proportion of Negro children in the school system was treated as creating a "natural inference" which was subject to rebuttal upon a proper showing. United States v. Jefferson County Board of Education, 372 F.2d 836, 887 (5th Cir. 1966), certiorari denied Caddo Parish School Board v. United States, 389 U.S. 840, 88 S.Ct. 67, 19 L.Ed.2d 103 (1967). Similarly, in the context of jury selection, the Court of Appeals for this Circuit has treated such evidence as persuasive but not dispositive. In Billingsley v. Clayton, 359 F.2d 13, 16 (5th Cir. 1966), certiorari denied 385 U.S. 841, 87 S.Ct. 92, 17 L.Ed.2d 74 (1966), it was stated that:

> Minimal representation of the group claimed to have been excluded from a particular jury roll in comparison with their proportion of the population is a proper element of proof, but such proof standing alone does not constitute sufficient evidence of constitutional violation if it is adequately explained and is not long continued.

■ At most, the demonstration of gross statistical disparity amounts to a prima facie showing of discrimination, thus shifting to the opposing party the burden of going forward with exculpatory evidence. Cf. Sims v. Georgia, 389 U.S. 404, 88 S.Ct. 523, 19 L.Ed.2d 634 (1967); Muniz v. Beto, 434 F.2d 697 (5th Cir. 1970). Under Title VII, such data has been viewed in this Circuit as establishing a "preliminary showing" of a violation. United States by Mitchell v. Hayes International Corporation, 415 F.2d 1038, 1043 (5th Cir. 1969). This is taken to mean that plaintiff, although still bearing the risk of non-persuasion, can by the use of persuasive statistics cast upon defendant the duty of producing at least equally persuasive controverting evidence if he can. See IX Wigmore on Evidence § 2487 (3rd ed. 1940).

Therefore, this Court will be guided by the broad statement of *Parham* only to the extent that it is consistent with the established principles outlined above.[1]

---

1. It is noteworthy that another Title VII case from the Eighth Circuit, decided subsequently to *Parham,* involved some particularly incriminating statistical data which the Court chose to regard as evidentiary rather than dispositive *per se.* Marquez v. Omaha District Sales Office, Ford Division of Ford Motor Company, 440 F.2d 1157, 1161 (8th Cir. 1971).

In the instant case, the statistical evidence does not make out a showing of discrimination. Instead, plaintiff's statistics were effectively countered and neutralized by defendant's statistics. As noted in finding of fact 10, supra, although defendant hired only one Mexican-American between the springs of 1967 and 1968, this single successful application produced the result that a greater percentage of Mexican-Americans were hired than were persons of any other racial or national origin group. Accordingly, the Court concludes that a showing of the national origin composition of defendant's work force between April 1, 1967 and April 1, 1968, does not entitle plaintiff to judgment as a matter of law. To the contrary, the statistical evidence in this case is conflicting, equivocal, and probative of nothing.

IV. Plaintiff must carry the burden of proving by a preponderance of the evidence that a violation of the Act occurred. Barnes v. Lerner Shops of Texas, Inc., 323 F.Supp. 617 (S.D.Tex. 1971).

V. Plaintiff has not proven that defendant had in the past or now has a practice, policy, custom, or usage of denying employment to Mexican-Americans.

VI. Plaintiff has not proven that defendants refused to employ plaintiff, or witness Carreon, or any other Mexican-American by reason of the applicant's national origin.

VII. Plaintiff has not proven that defendant violated the Civil Rights Act of 1964 or of 1866, 42 U.S.C. § 2000e et seq., § 1981.

VIII. To the extent that any of the foregoing findings of fact constitute conclusions of law, they are adopted as such. To the extent that any of the foregoing conclusions of law constitute findings of fact, they are adopted as such.

IX. Judgment shall enter for defendant.