Stephanie OTERO, Brenda Otero (minors) suing by and through their father and next friend, Ray H. Otero, Wilford Trujillo, Jr., Sara Jane Trujillo (minors) suing by and through their father and next friend, Wilford Trujillo, Sr., Rebecca Trujillo, Rhoda Romero, Jeanette Romero (minors) suing by and through their mother and next friend, Dora Romero, William D. Gallegos (a minor) suing by and through his mother and next friend, Lena Martinez, Plaintiffs,

v.

MESA COUNTY VALLEY SCHOOL DISTRICT NO. 51, Bruce Currier, Nadine Lippath, Miles Kara, W. G. Downer, Jack Wistcott, as members of the Mesa County Valley District No. 51 Board of Education, Donald Oglesby, as Superintendent of School District No. 51, Tedd S. Brumbaugh, as Director of Federal Programs of School District No. 51, Joseph P. O'Hara, as Director of Personnel of School District No. 51, Alvis D. D. Fetter, Arnold Hayes, Louis A. Grasso, Jr., Larry E. Turgoose, Sam Samuelson, John L. Johnson, Joseph A. Roscoe, William N. Baird, F. Ace Ballard, Charles L. Everett, Linden E. Moberly, E. J. Brown, Robert D. Vangundy, Robin D. Peckham, A. Deanhurt, Jerry W. Jordan, Jim Davis, Marguerite Beard, Frederick E. Dickensheets, John A. Crosby, John C. Fulham, Rosemary Faith, Ida M. Lauer, Ralph W. Wobick, Frank J. Folk, Kenneth M. Porter, Gilbert S. Roberts, Dolores J. Williams, Hazel B. Hurd, as

---

Principals within School District No. 51, all sued in both their individual and official capacities, Defendants.

Civ. A. No. 74–W–279.

United States District Court, D. Colorado.

Jan. 22, 1979.

Vilma S. Martinez, Morris J. Baller and Joel G. Contreras, Mexican American Legal Defense Fund, San Francisco, Cal., Remigio Pete Reyes, Mexican American Legal Defense Fund, Federico Pena, Denver, Colo., Edward Martinez, Colorado Rural Legal Services, Grand Junction, Colo., Leroy Cordova, Colorado Rural Legal Services, Denver, Colo., for plaintiffs.

John W. Groves and Jon E. Getz of Nelson, Hoskin, Groves & Prinster, Grand Junction, Colo., for defendants.

## MEMORANDUM OPINION

WINNER, Chief Judge.

This case was tried a long time ago. It was tried on a principal claim of lack of bilingual/bicultural education for the pupils in the school district, with overtones of employment discrimination. I didn't make many findings of fact on the statistics concerning alleged employment discrimination because this is a Title VI case and because I was convinced that parents of gradeschool children have no standing to challenge employment practices in a school district in employing secretaries, bus drivers, janitors and others. I was wrong in this belief, and the Court of Appeals has ordered that I make more detailed findings on the discrimination issue and it has directed that I consider *Hazelwood School District v. United States,* 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768, a case decided after my first opinion in this case.

A lot of water has passed over the dam since the opinion of the Court of Appeals [*Otero v. Mesa County Valley School District No. 51,* 568 F.2d 1312]. It was eleven months ago that rehearing was denied, but in the interim, conferences among the court and counsel have been held, and for quite a while it looked as if all of the remaining controversies would be settled. Unfortunately, they weren't, and the case is over-ripe for decision once more. With the exhibits received in evidence, the record in this case is of horrendous length, and, for that reason, plus the reason that my memory of the trial has dimmed, contrary to my usual practice, I asked counsel for each side to submit proposed findings and conclusions to help me meet the mandate of the Court of Appeals. Now I know why so much criticism has been aimed at the practice of having counsel prepare findings and conclusion. See, *United States v. El Paso Natural Gas* (1964) 376 U.S. 651, 84 S.Ct. 1044, 12 L.Ed.2d 12, *Roberts v. Ross* (1965) 3 Cir., 344 F.2d 757, and 9 Wright and Miller, Federal Practice and Procedure, § 2578. The Tenth Circuit has permitted, but it has criticized the practice. *Featherstone v. Barash* (1965) 345 F.2d 246, 10 Cir., and *M. B. Skinner v. Continental Industries, Inc.* (1965) 346 F.2d 170, 10 Cir., and most recently that court held adoption of findings prepared by counsel could be error. *G. M. Leasing v. United States* (1975) 514 F.2d 935, 10 Cir. (reversed in part on other grounds) and *Kelson v. United States* (1974) 503 F.2d 1291, 10 Cir. Competent counsel are, and they should be advocates, and counsel in this case are most competent which means that they are very good advocates. They just can't switch positions and it is unfair to ask them to do so. Their proposed findings are just more briefs, and I understand why they are. The proposed findings are helpful to me in making my findings, but they are helpful in a sense of being another brief rather than in the sense of being a statement of findings of fact which I can adopt. Both sides go farther in the proposals than I can go, and a good advocate should do just that. [In a few instances which I shall note with particularity I crib from the proposed findings *in haec verbae*].

With this introduction, then, I shall make my findings in narrative form in accordance with the provision of Rule 52 which says that "If an opinion or memorandum of decision is filed, it will be sufficient if the findings of fact and conclusions of law appear therein." As I have said, the only questions remaining in this case have to do with alleged employment discrimination. Although the pretrial procedures were long, involved and bitterly contested, I confess that the assertions of employment discrimi-

nation at time of trial caught me a little bit by surprise, but I allowed plaintiffs to proceed full speed ahead on that which I thought was collateral to their real complaint. I was surprised because of the language of the class certification order which itself stemmed from vigorous argument between the parties but which, for the most part, was in accordance with plaintiffs' desires as to definition of the class and the claims. The class certified was:

"All persons attending or entitled to attend Mesa County Valley School District No. 51 having a Spanish surname, and all other persons attending or entitled to attend such schools who consider themselves or are considered by the school or the community to be of Mexican-American origin or ancestry, who are being denied an equal educational opportunity because of their race or national origin in that the District's curriculum, *personnel*, and other programs provide an inadequate or unequal educational service which does not take into account their linguistic or cultural differences."

I guess that slipping in the word "personnel" opened up the case for review of employment practices, but that this was the thrust of the lawsuit didn't really come through to me when I signed the class certification order. I really don't see how these parents can be a proper class to make this challenge, but with the order entered, the discrimination claims grew like Topsy. The Court of Appeals explains that the case is brought under 42 U.S.C. § 2000d [which *is* Title VI and which *is not Title VII* of the Civil Rights Act of 1964], the Fourteenth Amendment and 20 U.S.C. § 1703. As I shall discuss presently, I think that the fact that this *is not a Title VII case* is quite important, and I think that the fact that this *is not a Title VII case* requires the application of different standards as to the essential elements of the wrong charged. However, having been directed by the Court of Appeals to make findings in accordance with the mandate of *Hazelwood*

*School District v. United States*, 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 [a Title VII case], I think that I am compelled to make findings necessary in a pattern and practice case which is what the Supreme Court said *Hazelwood* was. The Supreme Court said, "in 1973 the Attorney General brought this lawsuit against Hazelwood and various of its officials, alleging that they were engaged in a 'pattern or practice' of employment discrimination in violation of *Title VII* of the Civil Rights Act of 1964." Therefore, what I attempt to do in this memorandum opinion is to decide the case under the two statutes and constitutional provision pleaded as well as under Title VII which was not pleaded but which was the foundation for the Attorney General's lawsuit in *Hazelwood.* [Undeniably, this same confusion as to statutory basis was present throughout the trial, and undeniably the trial was a hodge podge of legal theories seemingly keyed to claimed "cumulative effect" of assorted alleged wrongs. With equal certainty, although not pleaded, from time to time plaintiffs attempted to try the case as if it were a "pattern and practice" case brought by the Attorney General which, of course, it wasn't. Although not articulated by me in my original opinion, this added to my conviction that plaintiffs were without standing, but, as I have said, I now know that plaintiffs had standing.]

 Title VI [42 U.S.C. § 2000d] is completely different from Title VII. Title VI only applies "to discrimination under any program or activity receiving federal financing assistance." [42 U.S.C. § 2000d]. It does *not cover* "any employment practice of any employer . . . *except where a primary objective of the federal financial assistance is to provide employment.*" Title VI is not a sweeping substitute for Title VII, and Title VI applies only when there is proof a primary objective of federal financial assistance to provide employment. There was not a scintilla of proof of any such program under which District 51 received financial assistance.[1] More impor-

---

1. District 51 received federal aid, but it received none meeting the tests of 42 U.S.C. § 2000d.

tantly, I read Title VI to say that intent is a required element, and there is absolutely no evidence that anyone connected with District 51 intentionally discriminated in any of its employment practices, be they employees, teachers, counselors, teachers' aides, janitors, bus drivers, secretaries or others.

In saying that I think that there must be some intent, I am not unaware of *Lau v. Nichols,* (1974) 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1, and I recognize that perhaps it can be argued to say that all plaintiffs have to prove in a Title VI case is "impact." However, the Court has disavowed that such is the intended meaning of *Lau.* It has been said that *Regents of the University of California v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750, decided nothing with its mass of opinions, but I think that *Bakke* did decide that Title VI requires the existence of the intent not necessary in some Title VII situations. Justice Marshall, joined by Justices White, Brennan and Blackmun said so at 438 U.S. 287, 98 S.Ct. 2747, and Justice Powell said as to Title VI, "In view of the clear legislative intent, Title VI must be held to proscribe only those racial classifications that would violate the Equal Protection Clause of the Fifth Amendment." After suggesting that *Washington v. Davis,* (1976) 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597, effectively explained that *Lau* should not be read to impose liability without proof of intent, Justice Marshall, still speaking for the same three of his fellow justices, said:

> "We agree with Mr. Justice Powell that as applied to the cases before us, Title VI goes no further in prohibiting the use of race than the Equal Protection Clause of the Fourteenth Amendment."

I discuss *Washington v. Davis,* (1976) 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597, because of its mention by Justice Marshall in *Bakke* and because of its several marked similarities to this case, albeit *Washington v. Davis* was brought on constitutional grounds alone and was not based on Title VI. In that case, District of Columbia police officers claimed racial discrimination on the part of the District's government. As the court pointed out in footnote 10 (426 U.S. 238, 96 S.Ct. 2040) Title VII standards dominated the trial and lower court's decisions in the case, even though the statute didn't reach federal employees until after the case was filed. The footnote continues:

> ". . . the 1972 amendments extending the Title to reach government employees were adopted prior to the District Court's judgment, (but) the complaint was not amended to state a claim under that Title, nor did the case thereafter proceed as a Title VII case. Respondents' motion for partial summary judgment, filed after the 1972 amendments, rested solely on constitutional grounds; and the Court of Appeals ruled that the motion should have been granted."

Some of the obvious similarities between *Washington v. Davis* and this case are, (a) both cases proceeded informally on Title VII grounds although Title VII wasn't pleaded, (b) the complaint could have been but it wasn't amended, and here, the class certification order stood unchanged, (c) the District of Columbia Court of Appeals acknowledged *Washington v. Davis* was a constitutional case, and the Tenth Circuit said in so many words that *Otero* is a case brought under Title VI. This is what the Supreme Court [and this time there were seven justices who joined in the opinion] had to say about the confusion of Title VII with other types of claims:

> "Because the Court of Appeals erroneously applied the legal standards applicable to Title VI cases in resolving the constitutional issue before it, we reverse its judgment in respondents' favor. Although the petition for certiorari did not present this ground for reversal, our Rule 40(1)(d)(2) provides that we 'may notice plain error not presented'; and this is an appropriate occasion to invoke the Rule. "As the Court of Appeals understood Title VII, employees or applicants proceeding under it need not concern themselves with the employer's possibly discriminatory purpose but instead may focus solely on the racially differential impact of the

challenged hiring or promotion practices. This is not the constitutional rule. We have never held that the constitutional standard for adjudicating claims of individual racial discrimination is identical with the standard under Title VII, and we decline to do so today.

"The central purpose of the Equal Protection Clause of the Fourteenth Amendment is the prevention of official conduct discriminating on the basis of race. It is also true that the Due Process Clause of the Fifth Amendment contains an equal protection component prohibiting the United States from invidiously discriminating between individuals or groups. *Bolling v. Sharpe,* 347 U.S. 497, [74 S.Ct. 693, 98 L.Ed. 884] (1954). But our cases have not embraced the proposition that a law or other official act, without regard to whether it reflects a racially discriminatory purpose, is unconstitutional *solely* because it has a racially disproportionate impact. . . .

". . . The school desegregation cases have also adhered to the basic equal protection principle that the invidious quality of a law claimed to be racially discriminatory must ultimately be traced to a racially discriminatory purpose. That there are both predominately black and predominately white schools in a community is not alone violative of the Equal Protection Clause. The essential element of *de jure* segregation is 'a current condition of segregation resulting from intentional state action.' *Kèyes v. School District No. 1,* 413 U.S. 189, 205 [93 S.Ct. 2686, 2696, 37 L.Ed.2d 548] (1973). 'The differentiating factor between *de jure* segregation and so-called *de facto* segregation . . . is purpose or intent to segregate.' Id. at 208 [93 S.Ct. at 2696, 37 L.Ed.2d at 561]. . . . The Court has also recently rejected allegations of racial discrimination based solely on the statistically disproportionate racial im-

pact of various provisions of the Social Security Act because 'the acceptance of appellants' constitutional theory would render suspect each difference in treatment among the grant classes, however lacking in racial motivation and however otherwise rational the treatment might be.' *Jefferson v. Hackney,* 406 U.S. 535, 548 [92 S.Ct. 1724, 1732, 32 L.Ed.2d 285]."

I am convinced that purposeful discrimination must be proved to recover under Title VI, and plaintiffs themselves really don't argue that they have proven intentional discrimination on anyone's part. If I misapprehend their position, I expressly say that even if discriminatory impact could be said to be established under this record, that would not be enough in a case resting on either constitutional grounds or on Title VI. Title VI and the Constitution permit recovery only where intent is proven, and there was no proof of any such intent. This is equally true as to plaintiffs' claim under 20 U.S.C. § 1703, *Morales v. Shannon,* (1975) 5 Cir., 516 F.2d 411.

The only possible way plaintiffs can win this lawsuit would be under Title VII principles applied to a Title VI case, and I have been directed by the Court of Appeals to make findings appropriate to a Title VII lawsuit. Under Title VII, of course, percentages are quite important. [The courts have unintentionally opened a Pandora's Box by using the word "statistics" instead of "percentages," because now Title VII cases are contests between college professor statisticians who revel in discoursing about advanced statistical theory.[2] The "least squares method", "area under the curve" and all sorts of distortions of linear regressions abound, but I think that in most cases, and certainly in this one, the courts are interested in percentages, and that there is no need for application of esoteric theories of probability.]

---

**2.** Judges are quite handicapped in trying to understand this testimony. In college I took algebra, advanced algebra, plane, solid and analytical geometry, trigonometry, calculus and statistics, circa 1932. Not long ago, I tried to enroll in a class in statistics, circa 1978, and was told it would require prerequisites taking two years to acquire before I could be initiated into the mysticisms of today's statistical theory.

As to the importance of the statistical evidence *in Title VII cases,* plaintiffs cite three cases from the Tenth Circuit, *Jones v. Lee Way Motor Freight,* 431 F.2d 245, 10 Cir., *Rich v. Martin Marietta Corp.,* 522 F.2d 333, 10 Cir., and *Muller v. United States Steel Corp.,* 509 F.2d 923, 10 Cir. Those cases do indeed support the necessity for review of statistical evidence in Title VII cases, and the United States Supreme Court has explained the function and application of such evidence. Because I am charged with a review of alleged job discrimination where the positions involve highly trained teachers who must be recruited from a limited employee pool and alleged discrimination in jobs requiring little or no training where much of the community constitutes the potential pool, I think it important to review some of the high court's comments as to the use of statistics in Title VII cases, and, indeed, I am directed by the Court of Appeals to test this case against *Hazelwood School District v. United States,* (1977) 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768. Before applying the specific tests of *Hazelwood* to the numbers in this case, the Supreme Court's comments concerning statistics, their use and applicability, must be fresh in mind. In *Hazelwood,* there was abundant live testimony from the discriminatees while in our case there is almost no live testimony from anyone who was allegedly the subject of discrimination, and the *Otero* plaintiffs' case is almost entirely percentages and surveys of dubious reliability. In *Hazelwood* the statistics buttressed the live testimony, but in *Otero* the Title VI case stands or falls almost entirely on percentage comparisons. In *Hazelwood* plaintiffs wanted to compare St. Louis County along with St. Louis City [a school system of entirely different racial composition] just as in this case plaintiffs want to make comparisons of apples and oranges.

The percentage comparisons to be used and the methods of use received close attention from Justice Stewart in *Hazelwood.* He said:

"The petitioners primarily attack the judgment of the Court of Appeals for its reliance on 'undifferentiated work force statistics to find an unrebutted prima facie case of employment discrimination.' The question they raise, in short, is whether a basic component in the Court of Appeals' finding of a pattern or practice of discrimination—the comparatively small percentage of Negro employees on Hazelwood's teaching staff—was lacking in probative force.

"This Court's recent consideration in *International Brotherhood of Teamsters v. United States,* 431 U.S. 324 [97 S.Ct. 1843, 52 L.Ed.2d 396], of the role of statistics in pattern or practice suits under Title VII provides substantial guidance in evaluating the arguments advanced by the petitioners. In that case we stated that it is the Government's burden to 'establish by a preponderance of the evidence that racial discrimination was the [employer's] standard operating procedure—the regular rather than the unusual practice.' [Id.,] At 336 [97 S.Ct., at 1855]. We also noted that statistics can be an important source of proof in employment discrimination cases, since

'absent explanation, it is ordinarily to be expected that nondiscriminatory hiring practices will in time result in a work force more or less representative of the racial and ethnic composition of the population in the community from which employees are hired. Evidence of long-lasting and gross disparity between the composition of a work force and that of the general population thus may be significant even though § 703(j) makes clear that Title VII imposes no requirement that a work force mirror the general population.' Id., at 340 [97 S.Ct., at 1856] n.20.

"See also *Village Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, at 266 [97 S.Ct. 555, at 564, 50 L.Ed.2d 450]; *Washington v. Davis,* 426 U.S. 229, 241–242 [97 S.Ct. 2040, 2048–2049, 48 L.Ed.2d 597]. Where gross statistical disparities can be shown, they alone may in a proper case constitute prima facie proof of a pattern or practice of discrimination. *Teamsters,*

supra, n.20 [431 U.S.] at 339 [97 S.Ct., at 1856].

"There can be no doubt, in light of the *Teamsters* case, that the District Court's comparison of Hazelwood's teacher work force to its student population fundamentally misconceived the role of statistics in employment discrimination cases. The Court of Appeals was correct in the view that a proper comparison was between the racial composition of Hazelwood's teaching staff and the racial composition of the qualified public school teacher population in the relevant labor market. [In footnote 13 this significant comment appears]:

"In *Teamsters,* the comparison between the percentage of Negroes on the employer's work force and the percentage in the general areawide population was high probative, because the job skill there involved—the ability to drive a truck—is one that many persons possess or can fairly readily acquire. When special qualifications are required to fill particular jobs, comparisons to the general population (rather than to the smaller group of individuals who possess the necessary qualifications) may have little probative value. The comparative statistics introduced by the Government in the District Court, however, were properly limited to the public school teachers, and therefore this is not a case like *Mayor v. Educational Equality League,* 415 U.S. 605 [94 S.Ct. 1323, 39 L.Ed.2d 630], in which the racial-composition comparisons failed to take into account special qualifications for the position in question. Id., at 620–621 [94 S.Ct., at 1333–1334]."

The text of the opinion continues:

"The percentage of Negroes on Hazelwood's teaching staff in 1972–1973 was 1.4% and in 1973–1974 it was 1.8%. By contrast, the percentage of qualified Negro teachers in the area was, according to the 1970 census, at least 5.7%. Although these differences were on their face substantial, the Court of Appeals erred in substituting its judgment for that of the District Court and holding that the Government had conclusively proved its 'pattern or practice' lawsuit.

"The Court of Appeals totally disregarded the possibility that this prima facie statistical proof in the record might at the trial court level be rebutted by statistics dealing with Hazelwood's hiring after it became subject to Title VII. *Racial discrimination by public employers was not made illegal under Title VII until March 24, 1972. A public employer who from that date forward made all its employment decisions in a wholly nondiscriminatory way would not violate Title VII even if it had formerly maintained an all-white work force by purposefully excluding Negroes.* For this reason, the Court cautioned in the Teamsters opinion that once a prima facie case has been established by statistical work force disparities, the employer must be given an opportunity to show 'that the claimed discriminatory pattern is a product of pre-Act hiring rather than unlawful post-Act discrimination.' Id., at 360 [97 S.Ct., at 1867].

"The record in this case showed that for the 1972–1973 school year, Hazelwood hired 282 new teachers, 10 of whom (3.5%) were Negroes; for the following school year it hired 123 new teachers, five of whom (4.1%) were Negroes. Over the two-year period, Negroes constituted a total of 15 of the 405 new teachers hired (3.7%). Although the Court of Appeals briefly mentioned these data in reciting the facts, it wholly ignored them in discussing whether the Government had shown a pattern or practice of discrimination. And it gave no consideration at all to the possibility that post-Act data as to the number of Negroes hired compared to the total number of Negro applicants might tell a totally different story.

"What the hiring figures prove obviously depends upon the figures to which they are compared. The Court of Appeals accepted the Government's argument that the relevant comparison was to the labor market area of St. Louis County and the city of St. Louis, in which, according to the 1970 census, 15.4% of all teachers

were Negro. The propriety of that comparison was vigorously disputed by the petitioners, who urged that because the city of St. Louis has made special attempts to maintain a 50% Negro teaching staff, inclusion of that school district in the relevant market area distorts the comparison. Were that argument accepted, the percentage of Negro teachers in the relevant labor market area (St. Louis County alone) as shown in the 1970 census would be 5.7% rather than 15.4%. "The difference between these figures may well be important; the disparity between 3.7% (the percentage of Negro teachers hired by Hazelwood in 1972–1973 and 1973–1974) and 5.7% may be sufficiently small to weaken the Government's other proof, while the disparity between 3.7% and 15.4% may be sufficiently large to reinforce it. In determining which of the two figures—or very possibly, what intermediate figure—provides the most accurate basis for comparison to the hiring figures at Hazelwood, it will be necessary to evaluate such considerations as (i) whether the racially based hiring policies of the St. Louis City School District were in effect as far back as 1970, the year in which the census figures were taken; (ii) to what extent those policies have changed the racial composition of that district's teaching staff from what it would otherwise have been; (iii) to what extent St. Louis' recruitment policies have diverted to the city teachers who might otherwise have applied to Hazelwood; (iv) to what extent Negro teachers employed by the city would prefer employment in other districts such as Hazelwood; and (v) what the experience in other school districts in St. Louis County indicates about the validity of excluding the City School District from the relevant labor market."

As has been said, our Title VI case was presented pretty much as if it were a Title VII "pattern and practice" case.[2] That being so, some quotations from *International Brotherhood of Teamsters v. United States* (1977) 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396, in addition to the quotations from *Hazelwood* are in order. Justice Stewart there said:

"As the plaintiff, the Government bore the initial burden of making out a prima facie case of discrimination. *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 425 [95 S.Ct. 2362, 2375, 45 L.Ed.2d 280]; *McDonnell Douglas Corp. v. Green,* supra, 411 U.S., at 802 [93 S.Ct., at 1824]. And, because it alleged a systemwide pattern or practice of resistance to the full enjoyment of Title VII rights, the Government ultimately had to prove more than the mere occurrence of isolated or 'accidental' or sporadic discriminatory acts. It had to establish by a preponderance of the evidence that racial discrimination was the company's standard operating procedure—the regular rather than the unusual practice.

. . . . .

"The Government bolstered its statistical evidence with the testimony of over 40 specific instances of discrimination. [Testimony importantly almost totally lacking in this case.]"

I could quote at length from *Teamsters,* but suffice it to say that although statistics are to be considered, as the court said, "statistics are not irrefutable; they come in infinite variety and, like any other kind of evidence, they may be rebutted." My personal evaluation of expert testimony by professorial statisticians is somewhat less complimentary. I am confident that one professor can claim to prove statistically that two plus two equals three while another can use the same statistics to show that two plus two equals five. The disagreements are compounded by the proliferation of pocket calculators programmed to

2. Claiming Title VI jurisdiction was no inadvertent error on plaintiffs' part. During the pretrial skirmishing, every effort was made to cut off District 51's funds by utilization of Title VI approaches, and it was not until these efforts barely failed that plaintiffs switched to a Title VII pattern and practice approach. Pleading jurisdiction under 20 U.S.C. § 1703 was in furtherance of a Title VI approach and it had little or nothing to do with a Title VII class action.

various statistical methods, and all a trial judge whose statistics course dates back 45 years can do is to try to use his limited knowledge of this quasi-mathematical approach to a problem and then temper the argued for results with a pinch of common sense. That's why I wish the appellate courts would talk about "percentages" instead of "statistics", because most trial judges learned percentages in the sixth grade. Be that as it may, under a Title VII approach, I have to use the "statistical evidence" such as it is, because as is said in footnote 20 of *Teamsters*:

> "Since the passage of the Civil Rights Act of 1964, the courts have frequently relied upon statistical evidence to prove a violation . . . .. In many cases the only available avenue of proof is the use of racial statistics to uncover clandestine and covert discrimination by the employer or union involved." (citing cases, including *Jones v. Leeway Motor Freight, Inc.*, 10 Cir. 431 F.2d 245.)

The high court's infatuation with "percentages" denominated as "statistics" tracks down to the current month when the Court passed upon the constitutionality of a jury plan. [*Duren v. Missouri*, (1979) —— U.S. ——, 99 S.Ct. 664, 58 L.Ed.2d 579.] With this comment, I finally reach the making of the factual determinations as to important percentages.[3] Some I extract from the proposed findings and record references of plaintiffs, and some I dig out of defendants' materials and record references:

■ Geographically, defendant School District is one of the largest in the United States. It takes care of the education of almost all of the children in Mesa County, a county located on Colorado's western slope, the principal city of which is Grand Junction. Historically, the county has an agricultural/ranching economic base, but in recent years Grand Junction and the surrounding area has developed rapidly as a center for light manufacturing and it has been described as the energy center of the United States. The District operates in typical fashion under the supervision of an elected school board and an employed staff. As is true in all school districts, employees are both professionals and non-professionals, and, since Title VII findings are required, footnote 13 of *Hazelwood* necessitates separate consideration of the professionals and the non-professionals. All of the elected board members are Anglos, but Title VII places no restrictions on the voters in deciding who they want to vote for. Most of the upper echelon personnel are Anglo, but their positions have been reached by a promotional process keyed to years of service, and even if it be assumed that in years past promotions were racially motivated, [and I make no such finding] *Hazelwood* said, "Racial discrimination by public employers was not made illegal under Title VII until March 24, 1972 [our trial was not long after that effective date]. A public employer who from that date forward made all its employment decisions in a wholly nondiscriminatory way would not violate Title VII even if it had formerly maintained an all-white work force by purposefully excluding negroes." Plaintiffs' pre-Act statistics were received for the record, but evidence of post March 24, 1972, discrimination just wasn't presented. During the 1973–1974 school year, there were 12,942 students in the district, 1,063 of whom [8.2%] were probably Mexican-American. As to teachers employed by the District after the effective date of the Act, plaintiffs presented nothing touching upon the size or ethnic composition of the total pool of applicants. This, in my judgment, is an approach absolutely required under *Hazelwood*. Defendant School District met the problem head-on. For the critical period from 1971 through mid 1974, there were these vacancies in certified positions:

| School Year | Vacancies |
| --- | --- |
| 1971–1972 | 90 |
| 1972–1973 | 99 |
| 1973–1974 | 101 |

---

**3.** Working from the same trial record, counsel came up with diametric arithmetic answers, and I do not purpose to make anywhere near all of the findings either side proposes. Hopefully, I shall make enough to show the Court of Appeals the basis for my ruling.

■ Between 1971 and mid-1974, 394 certified employees were hired out of a total applicant pool of 3,151. Spanish surnamed applicants made up 1.6% of the applicants, and 98.2 of the persons who applied were Anglo. For this time period, 38% of the Chicano applicants were hired, and 12% of the Anglos got jobs. Using as a basis for comparison total hires of certified employees, 4.8% of the new hires were Chicano. On the naked record, then, I suppose that some adverse implication can be drawn from the 4.8% of new hires compared to the 8.2% Mexican-American composition of the student body. But, as has been emphatically said by the Supreme Court, explanations are in order, and the explanation here is irrefutable. In the simplest of terms, Mexican-American teachers were possessed of a sellers' market during the critical period, and they could get a job just about anywhere they wanted to. As I shall discuss presently, District 51 recruited teachers almost as avidly as Nebraska recruits tailbacks, but when letter of intent day came, it couldn't sign them up. District 51 couldn't compete with the higher salaries and the bright lights of the big cities. Plaintiffs say that there were 74 Chicano applicants for teachers' jobs, but I don't entirely buy the way plaintiffs decided who were "applicants." Defendants generously added 11 names to plaintiffs' list of 74. Of these 85 teacher-applicants, only three were refused employment, and justifiable reasons for the three refusals were given. As to the 74 alleged teacher-applicants underlying plaintiffs' statistical case, the record shows that actual offers were made to 15, the District tried to make an employment offer to 10, 24 seemingly lost all interest because they didn't complete their applications, there was no job opening of the kind sought by 17 applicants, and three weren't Mexican-American. As I have said, three were justifiably rejected, and adequate information isn't available as to the other two.

Just to join in the numbers game, then, it seems to me that these numbers show that there were 45 Mexican-American applicants, 37.7% of whom applied for jobs which weren't open, 55.5% of whom the District tried to hire, and 6.6% of whom weren't hired because they weren't qualified. However, just to show that judges can juggle numbers right along with the experts, these same numbers show that of the Chicanos who applied to be hired into actual job vacancies, the District tried to employ 89.9%, and 10.7% were rejected on qualification grounds. Thus, depending on the way the numbers are manipulated, we come up with 4.8% of the new hires as being Chicanos compared with a good faith effort to hire 89.9% of the Chicano applicants. It all depends on what is divided by what. Once more we must look at footnote 13 in *Hazelwood*, because the comparison attempted by plaintiffs here is even more meaningless than was the comparison relied upon by the government there. It is far less logical to try to compare "applicants" who didn't complete an application with hires than it is to compare St. Louis County with St. Louis City, and it is just as illogical to base a claim of discrimination on applications for non-existent jobs. I worry that the mandate from the Court of Appeals I think says that I should discuss separately each of the 74 "teacher applicants" who were allegedly discriminated against. At the risk of not doing that which the Appellate Court wants, I am not going to go through a detailed discussion. Instead, I openly crib from defendant's proposed findings, and give the record references for each individual [all of which I have read]. In my judgment, with the exception of the three applicants who were thought to be professionally unqualified, the record shows in detail that which I have discussed in summary form just now. These are the record references:

| Exhibit Number | Name | Rebuttal Reference |
|---|---|---|
| E–43 | Robert A. Gonzales | Tr. XXV–5 |
| E–44 | Anthony Cardenas | 1283a |
| E–45 | Aurora Hernandez | Tr. XXV–11, 12, 13; Tr. XXIV–105, 106 |
| E–46 | Michael A. Lopez | Tr. XXIV–135, 138 |
| E–47 | Beau A. Pacheco | Tr. XXIV–128 |
| E–48 | James C. Soldano | Tr. XXIV–128; Tr. XXV–13, 14 |
| E–49 | Daniel Albeyta | Tr. XXI–54, 55 |
| E–50 | Amelia Hernandez | 1283a |
| E–51 | Dolores Jacobs (Sierra) | 1283a |
| E–52 | Benerito Martinez | Tr. XXI–103–108 |
| E–53 | Seraphine Medina | Tr. XXIV–129 |
| E–54 | David Navarro | Tr. XXIV–129 |
| E–55 | Manual Sanchez | Tr. XXIV–129 |
| E–56 | Anita L. Wasserburger (Aguilar) | Tr. XXI–110 |
| E–57 | Haim Calderon | Tr. XXV–8 |
| E–58 | Adam Cuevas | Tr. XXV–14, 15; Tr. XXIV–130 |
| E–59 | Victoria Cuevas | Tr. XXV–14, 15; Tr. XXIV–130 |
| E–60 | John A. Fajardo | 1283a |
| E–61 | Irineo S. Juan | Tr. XXV–8 |
| E–62 | Anthony A. Lopez | 1283a |
| E–63 | James A. Lopez | 1283a |
| E–64 | James E. Salazar | Tr. XXIV–131 |
| E–65 | Ruben Earnest Salazar | Tr. XXIV–131 |
| E–66 | Jane L. Sausa | 1283a |
| E–67 | Celina Strand (C. de Baca) | Tr. XXIV–131, 132 |
| E–68 | Joe L. Vigil | Tr. XXIV–132 |
| E–69 | Ray A. Vigil | Tr. XXIV–132 |
| E–70 | Roger Elias Vigil | Tr. XXV–16, 17, 18 |
| E–71 | Jerry A. Candela | 1283a |
| E–72 | Ronald A. Lucero | Tr. XXIV–132 |
| E–73 | Michael J. Quintano | 1283a |
| E–74 | Jeanne Sategna (Rodriguez) | 1283a |
| E–75 | Phillip Sategna | 1283a |
| E–76 | John Tamayo | 1283a |
| E–77 | Antonio Jose' Trujillo, Jr. | Tr. XX–68–69, 134, 135 |
| E–78 | Wayne A. Vala | 1283a |
| E–79 | Javier Abrego | 1283a |
| E–80 | J. Robert Armenta | 1283a |
| E–81 | George A. Barrio | Tr. XX–69; Tr. XX–135 |
| E–82 | Sara E. Cabrera | Tr. XXIV–132, 133 |
| E–83 | Guadalupita Calles | Tr. XX–69 |
| E–84 | Levi Casias | Tr. XX–69; Tr. XX–135–137; Tr. XXIII–16, 17 |
| E–85 | Lonnie J. Cavaliere | Tr. XXIV–133 |
| E–86 | Marc Anthony Cordova | Tr. XX–70; Tr. XX–137, 138 |
| E–87 | Marie Garza | 1283a |
| E–88 | Albert Gonzales | Tr. XX–70; Tr. XX–138, 139 |
| E–89 | Brenton Bert Gonzales | 1283a |
| E–90 | Juan J. Gonzales | Tr. XX–71, 139; Tr. XXI–113 |
| E–91 | Patricia L. Gonzales | Tr. XX–139; Tr. XX–71 |
| E–92 | Darlene H. Gurule | 1283a |
| E–93 | Charles D. Gutierrez | 1283a |
| E–94 | Adolfo Guzman | Tr. XXIV–134; Tr. XX–71, 141, 142 |
| E–95 | Bernadine Hernandez | Tr. XX–72, 142, 144 |
| E–96 | David Jacques | Tr. XX–73 |

| Exhibit Number | Name | Rebuttal Reference |
|---|---|---|
| E–97 | Hellen I. Larkins (Armijo) | Tr. XX–73, 74, 75 |
| E–98 | Stanley A. Lucero | Tr. XXI–2; Tr. XX–74, 75 |
| E–99 | Jose' L. Madrid | Tr. XX–75; Tr. XXI–23 |
| E–100 | Richard J. Maestas | 1283a |
| E–101 | Mario B. Maldonado | Tr. XXIV–134 |
| E–102 | Terry A. Marquez | Tr. VI–40; Tr. XXI–4, 5, 11; Tr. XX–76–78 |
| E–103 | Frank L. Martinez | Tr. XXI–5; Tr. XX–80, 136 |
| E–104 | Theresa J. Martinez | Tr. XXI–6; Tr. XX–81 |
| E–105 | Mary Rayas | 1283a |
| E–106 | John C. Rocha | 1283a |
| E–107 | Rica C. Ruybal | Tr. XX–81, 82 |
| E–108 | Naomi Salazar | Tr. XXI–111 |
| E–109 | Eva Sanchez | Tr. XX–83 |
| E–110 | Bernice Y. Sapien | 1283a |
| E–111 | Kenneth M. Servais | Tr. XX–83 |
| E–112 | Roberta Marquez Stutsman | Tr. XX–84; Tr. XXI–69; Tr. XXV–8, 9 |
| E–113 | Carlos W. Tolar | 1283a |
| E–114 | Antonio Trujillo | Tr. XXIV–134; Tr. XXV–9, 10 |
| E–115 | David M. Trujillo | Tr. XXIV–134; Tr. XXV–9, 10, 11 |
| E–116 | Ramon J. Valdez | 1283a |
| E–117 | Benjamin L. Vazquez | Tr. XXIV–135; Tr. XX–85, 86; Tr. XXI–10 |
| E–118 | Ricardo Zavala | Tr. XXIV–102 |

Probably I should talk a little more about the efforts District 51 made to recruit Mexican-American teachers. Because of litigation pending and threatened throughout the United States, competition for minority teachers was fierce, and no school district could count on having many walkons. District 51 sent recruiting teams to:

1969 – Northern State College, Aberdeen, South Dakota
University of South Dakota
University of Nebraska
Kearney College Nebraska
Kansas State University
University of Kansas
Pittsburgh College Kansas
Ottawa College Kansas
Brigham Young University
University of Utah
Eastern New Mexico University
West Texas State
Texas Tech
Aberdeen Christian
McMurry College, Abilene, Texas
Hardin-Simmons College, Texas
Midwestern University of Wichita Falls, Texas

1970 – University of New Mexico
An unnamed college in Texas

1971 – Recruitment in unnamed colleges in Idaho, Washington and Utah

1972 – Adams State College
New Mexico Highlands
New Mexico State University
Arizona State University

1974 – Southern Colorado State University
(January & University of Northern Colorado
February) Adams State University

Although the earlier trips didn't take direct aim at minority recruiting, there was no proof that Mexican-American graduates were treated any differently from Anglos. In later years, specific efforts were made to entice Mexican-American teachers to Grand Junction. Representatives from the local minority community talked to potential applicants, and efforts were made to get advance information from the colleges as to possible minority teacher applicants. Spanish language advertisements were run, and advertisements were published in educational magazines seeking Mexican-American teachers. Interview requirements for minority applicants were lessened, and contract review requirements applied to Anglos were waived where a Mexican-American would agree to sign a contract on the spot. Beyond peradventure, if there was discrimination in the teacher hiring policies of Dis-

trict 51, it was reverse discrimination to the prejudice of the Anglos and to the benefit of the Mexican-Americans. Where this may ultimately lead remains to be seen, because it was not a quota type discrimination such as that condemned in *Bakke*, and the Supreme Court has yet to speak on the type of favoritism shown Mexican-American applicants by District 51. That preferential treatment was probably intentional in the sense that the School Board was operating in an area of legal uncertainty as to what the law was or is, but it was not intentional in the sense of being a purposeful violation of the law. In my judgment, District 51 and every other school board was and is trying to run a school system in a never-never land of legal confusion and uncertainty, and from my review of this long, long record, I think that District 51 has done a commendable job of employing Mexican-American professionals, even though its blandishments frequently couldn't overcome the higher pay and different social life available in larger cities desired by the Mexican-American teacher graduates.

I come now to the non-professionals, who were not blessed by the same seller's market possessed by the teachers and who were not part of a similar limited labor pool. The most recent census figures show that Spanish surnamed males constitute 5% and Spanish surnamed females constitute 3% of the entire Mesa County labor force. Utilizing the approach required under *Hazelwood*, between 1969 and 1975, 300 teachers aides were hired, of whom 38 were Spanish surnamed. [This is 12.66%, and even if 1975 be excluded, the percentage is 10.3%.] The ethnic composition of the applicant pool isn't available in the record, and all that can be done here is to go to the work force figures. Since teachers' aides aren't certificated, this is probably all right under *Hazelwood* and *Teamsters*. Acting on the assumption that most teachers' aides are female, I can't find any statistical evidence of discrimination when the 12.66% employment figure be compared with the 3% labor pool figure. It seems to me that in this area of employment, there may be a little Chicano overrepresentation.

When we come to other types of classified [non-professional] types of work, the figures relied on by both plaintiffs and defendants aren't very complete. It can be gleaned from the record that during the five years prior to the filing of this lawsuit, the District hired 49 Spanish surnamed teachers' aides, 10 Spanish surnamed clerks, 25 Spanish surnamed custodians, 16 Spanish surnamed people in food service, and 8 Spanish surnamed bus drivers. This information isn't very meaningful, because the data as to ethnic composition of job applicants isn't in the record, and apparently it doesn't exist. There was a large labor pool, but I can't decipher from the available information the data as to total applicants. I reject plaintiffs' use of employee directories because I am convinced from the testimony that they are an unreliable source. I can extract from the testimony that only 3 Chicanos applied for one of the 65 bus driver jobs that opened up during a 20 month period. The utter confusion in the evidence which is available for the period in question [much of which was before public employers became subject to Title VII] is demonstrated by the diametric interpretations of the record by the parties. Suffice it to say that I think the record should be read to show that of the classified [non-certificated] jobs filled during the period, at least 7.4% of the new hires were Spanish surnamed. Probably in a few job classifications District 51 is very slightly [maybe one or two percent] below employment which would meet the comparative percentage of the Mexican-American labor market in Mesa County. I don't think that fairly evaluated, the percentage figures can or should be interpreted to show discrimination, but, later, I am going to assume that plaintiffs in this Title VI case have made a prima facie Title VII case under the *McDonnell-Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668, test.

Plaintiffs say that 119 qualified Mexican-Americans were denied employment. Because of *Furnco Construction Co. v. Waters*, 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957,

*Board of Trustees of Keene State College v. Sweeney,* 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216, *Fitzpatrick v. Board of Education,* (1978) 10 Cir., 578 F.2d 858, *Diggs v. Western Electric Company,* (1978) 10 Cir., 587 F.2d 1070, and a host of other cases, and once more at risk of not complying with the intent of the Court of Appeal's mandate, I shall not discuss individually and separately each of the 119 alleged discriminatory practices on the part of defendants. Instead, painting with a broad brush, 55.5% of the individuals applied after the lawsuit was filed, and, although information was not available as to the reasons some were not hired, there was no evidence even suggesting that the failure to hire was racially motivated. The real problem arose in that all there was was file data plus the recollection of District administrators, and the applicants didn't testify to refute those recollections. As to secretaries who were allegedly discriminated against, here are a few examples of what happened:

Ymelda Aguirre Kistler was offered the job but turned it down.

Bernice Antonio was turned down because she could type only forty words per minute and an Anglo applicant could type 60.

Ernest J. Archibeque took 40 minutes to complete a typing test in which he made 27 errors. The District hired an Anglo who took 15 minutes to finish the test and who made 9 errors.

Mabel Vigil Jones took 40 minutes to complete the test and she made 43 errors. The successful applicant finished the test in a third of the time and made 9 errors.

Mary Vasquez took almost twice as long to complete the test as did the successful applicant.

Cecelia Maestas Graybull took twice as long and made twice as many errors as did the successful applicant.

Theresa Sanchez was very well qualified. She was offered the job in writing, and when she didn't respond, the supervisor drove to her home to try to persuade her to accept the position. She wasn't there, but a copy of the written job offer was left at the home.

Ida Perez was an extremely poor typist. She was offered an interview for a job which didn't require typing and said she wasn't interested.

The foregoing list doesn't cover all of the alleged applicants for secretarial positions plaintiffs say were discriminated against, but I have gone over every one of the names and the record made. With the exception of the few cases where no one recalled the applicant or the circumstances, a perfectly logical, reasonable and non-discriminatory reason was given for the failure to hire, and I believed the testimony.

As to the applicants for food service workers plaintiffs say were discriminated against because of their race, the record shows:

Masilla Rose Allegra is not a Mexican-American.

Andrea M. Archuleta was offered a job but couldn't accept it for health reasons. She applied a year later and was again offered a job. She turned down that job offer because she had received a better job with the telephone company.

Barbara Romero was offered a job but turned it down.

JoAnn Martinez was offered substitute work and she was offered a job in an area other than the area she wanted to work in. She turned down the offers.

Ellen Vigil. She was and is employed by the District.

Judy A. Urgueya couldn't be located when the District wanted to contact her.

The record shows that from 1972 to time of trial 36% of the Spanish-surnamed applicants for food service jobs were offered employment.

Bus drivers come next. Plaintiffs say that seven Mexican-Americans were refused jobs as bus drivers because of their race. This is what the record shows as to the reasons for failing to hire:

John Esquibel wouldn't arrange a time for an interview.

Jesse Patrick Lueras had a horrible driving record and was thought to be too

great a risk to the childrens' lives to permit him behind the wheel of a school bus.

Joe Adonis Miera wanted a full-time job, and there aren't any full-time jobs as bus drivers.

Dennis Trujillo. He matched Jesse Patrick Lueras.

Alfred Jerry Pacheco. He did too.

Phil Otero. He was offered an interview but didn't show up.

Annette Banuelos got a better job.

Between 1972 and 1975 only 11 Mexican-Americans applied for a bus driver's job and 36% of them were offered jobs. The school board didn't recruit for these jobs because they were unskilled, and the only figures available are those having to do with what happened to the applicants.

Plaintiffs say that 23 applicants for custodial jobs were discriminated against. The proof doesn't show it, and here are illustrations as to why the named individuals [who didn't testify] weren't employed.

Richard Guzman's name appears three times on the list of 23. There was no job opening when he applied, and then he wanted a job requiring typing skills, but he couldn't type.

Philip Archuleta. He didn't show up for a scheduled interview, but he sent his brother. The brother got the job.

Ben Renteria was not employed because the man who was hired was thought to be much more qualified.

Patricia Garcia accepted another job with the District.

Sandy Gonzalez wouldn't complete his application form.

Abe Herrera wanted a higher paying job.

Ronald Quintana wasn't hired because there wasn't any opening.

Roger Mestas wasn't hired, but another Mexican-American was.

Sircino Martinez didn't show up for his job interview.

Elroy Gomez. He didn't either.

At the time of trial, 5.5% of District 51's custodial work force was Mexican-American, and from 1973 to the time suit was filed, 25% of the Chicanos who applied were hired. There wasn't any live testimony from any of the individuals plaintiffs say were discriminated against, and just how the childrens' parents adequately represent these persons in a class action I will never know. I do know that when I approved the class certification order which was the subject of so much haggling I didn't understand where plaintiffs were headed in their lawsuit. This case is the perfect example of dangers existing in class action lawsuits. I have already been reversed in my holding that childrens' parents don't have standing to challenge a school district's policies in hiring janitors, and that I accept. However, I still don't understand how these parents meet the adequacy of representation requirements of Rule 23, but I have been directed to follow the requirements of *Hazelwood* promulgated by the Supreme Court in a pattern and practice case.

The first thing the Supreme Court ordered the district judge to do in *Hazelwood* was to decide "whether the racially based hiring policies of the St. Louis City School District were in effect as far back as 1970, the year in which the census figures were taken." The St. Louis City District is comparable to other school districts in Colorado under the facts of our case. I find that the scramble for minority teachers in Colorado started long before 1970. Next the Supreme Court said that the district judge should determine "to what extent those policies have changed the racial composition of that district's teaching staff from what it would otherwise have been." There is nothing in the record to permit me to make a specific finding in this regard, but the record does show that there was an increase in Mexican-American teachers throughout the state as well as in District 51. The next direction was to look into "what extent St. Louis' recruitment policies have diverted to the city teachers who might otherwise have applied to Hazelwood." Again, I can't make a finding of specific numbers, but I do find that were it not for the recruiting drives of competing school districts in which higher salaries are paid, there would have

been more Chicano applicants for teaching positions in Grand Junction. The Supreme Court said that there should be a finding as "to what extent Negro teachers employed by the city would prefer employment in other districts such as Hazelwood." There is nothing in the record on which to base a finding as to whether Chicano teachers who may be employed in Denver would prefer to teach in Grand Junction. The final thing the district judge in *Hazelwood* was ordered to do just doesn't fit here.

In *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668, a four-pronged test was laid down to be used as a guide in employment discrimination cases. It was there said that to make out a prima facie case of discrimination a plaintiff has to show:

"(i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications." 411 U.S., at 802, 93 S.Ct., at 1824 (footnote omitted).

Having shown that, then, a defendant is given the opportunity to explain that the failure to hire was not based on illegal grounds and the plaintiff may then offer evidence that the defendant's explanation is pretextual. I have to stretch to say that even if this were a Title VII case, these class action plaintiffs have established a prima facie case under the *McDonnell-Douglas* approach, but I am going to assume that the burden has been met. With this assumption, I reach *Furnco Construction Corporation v. Waters* (1978) 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957. Lower courts differed in their interpretation of *McDonnell-Douglas*, and in *Furnco* the Seventh Circuit was reversed in its holding that an explanation that *Furnco* gave hiring preference to those deemed most competent was not a " 'legitimate, nondiscriminatory reason' for defendant's refusal to consider plaintiffs." In reversing, and speaking for seven members of the Court, Justice Rehnquist said:

"We think the Court of Appeals went awry, however, in apparently equating a prima facie showing under McDonnell Douglas with an ultimate finding of fact as to discriminatory refusal to hire under Title VII; the two are quite different and that difference has a direct bearing on the proper resolution of this case. The Court of Appeals, as we read its opinion, thought Furnco's hiring procedures not only must be reasonably related to the achievement of some legitimate purpose, but also must be the method which allows the employer to consider the qualifications of the largest number of minority applicants. We think the imposition of that second requirement simply finds no support either in the nature of the prima facie case or the purpose of Title VII. "The central focus of the inquiry in a case such as this is always whether the employer is treating 'some people less favorably than others because of their race, color, religion, sex, or national origin.' *International Brotherhood of Teamsters v. United States*, supra [431 U.S.], at 335 n. 15 [97 S.Ct., at 1854]. The method suggested in *McDonnell Douglas* for pursuing this inquiry, however, was never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination. A prima facie case under *McDonnell Douglas* raises an inference of discrimination only because we presume these acts, of otherwise unexplained, are more likely than not based on the consideration of impermissible factors. See *International Brotherhood of Teamsters v. United States*, supra [431 U.S.], at 358 n. 44 [97 S.Ct., at 1866]. And we are willing to presume this largely because we know from our experience that more often than not people do not act in a totally arbitrary manner, without any underlying reasons, especially in a business setting. Thus, when all legitimate reasons for rejecting an applicant have been eliminated

as possible reasons for the employer's actions, it is more likely than not the employer, whom we generally assume acts only with *some* reason, based his decision on an impermissible consideration such as race.

"When the prima facie case is understood in the light of the opinion in *McDonnell Douglas,* it is apparent that the burden which shifts to the employer is merely that of proving that he based his employment decision on a legitimate consideration, and not an illegitimate one such as race. To prove that, he need not prove that he pursued the course which would both enable him to achieve his own business goal *and* allow him to consider the *most* employment applications. Title VII forbids him from having as a goal a work force selected by any proscribed discriminatory practice, but it does not impose a duty to adopt a hiring procedure that maximizes hiring of minority employees. To dispel the adverse inference from a prima facie showing under *McDonnell Douglas,* the employer need only 'articulate some legitimate nondiscriminatory reason for the employee's rejection.' *McDonnell Douglas, supra* [411 U.S.], at 802 [93 S.Ct., at 1824]." (emphasis by the court).

Then, along came *Board of Trustees of Keene State College v. Sweeney,* (1978) 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216, where the Supreme Court reversed a Court of Appeals opinion which required the defendant "to prove absence of discriminatory motive," because, said the Supreme Court, all that is required is that the defendant "articulate" a non-discriminatory reason. This is what the per curiam opinion says:

"While words such as 'articulate,' 'show,' and 'prove,' may have more or less similar meanings depending upon the context in which they are used, we think that there is a significant distinction between merely 'articulat[ing] some legitimate, nondiscrimination reason' and 'prov[ing] absence of discriminatory motive.' By reaffirming and emphasizing the *McDonnell Douglas* analysis in *Furnco Construction Co. v. Waters,* supra, we made it clear

that the former will suffice to meet the employee's prima facie case of discrimination. Because the Court of Appeals appears to have imposed a heavier burden on the employer than *Furnco* warrants, its judgment is vacated and the case is remanded for reconsideration in the light of *Furnco,* supra [438 U.S.], at 579 [98 S.Ct., at 2950]."

After *Furnco* and after *Keene State College,* Judge McWilliams said in *Diggs v. Western Electric Company, Inc.,* (1978) 10 Cir. 587 F.2d 1070, "In our view, Western Electric articulated a nondiscriminatory reason for not hiring Exola Diggs, which meets the burden imposed on it by the *Board of Trustees of Keene State College v. Sweeney,* 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216; *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed. 957, and *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668."

Under the more burdensome test erroneously applied by the Court of Appeals in *Furnco,* I would hold that District 51, "proved" nondiscriminatory reasons for not hiring the few Chicano applicants who weren't offered a job, and under the test of *Keene State College,* the same result is even clearer. There is not any evidence of either discriminatory intent nor is there evidence of pretextual reasons for failure to employ. It is easy to criticize, and arguably it would be socially better if there were more Chicano teachers in the Mesa County school system. However, as was said by Judge McKay in *Fitzpatrick v. Board of Education,* (1978) 10 Cir., 578 F.2d 858, "It is true, as plaintiffs contend, that attempts to hire more black teachers and staff have not been particularly successful. The unsatisfactory results were, however, more than adequately explained by factors outside the control of the Board—and generally lower wages available in Oklahoma and the fact that black professionals prefer to live in areas with larger black populations." I think that District 51's efforts have be astonishingly successful taking into account the same factors mentioned by Judge McKay.

I find that there was no discrimination on the part of District 51 in any of its employment practices, and in conclusion I quote that which I think is the most important sentence in *Furnco*:

"Courts are generally less competent than employers to restructure business practices, and unless mandated to do so by Congress they should not attempt it."

This thinking applies with extraordinary force in school district cases, and courts should interfere with academic freedom only when the law requires it. There is no requirement for such meddling here because there has been no discrimination by District 51. Once more, I direct that the Clerk enter judgment forthwith in favor of the defendants and against the plaintiffs. Defendants, of course, shall be awarded their taxable costs, and it is just too bad that the many, many thousands of dollars and the many, many thousands of work hours spent on this case couldn't have been used to further the education of the children of Mesa County. Unfortunately we live in an age of constant litigation in which the courts are asked to structure a perfect world, and the courts are no more competent to do that than is the Congress or the general public.